**Carole A. RAYBURN, Appellant,**

**v.**

**GENERAL CONFERENCE OF SEVENTH–DAY ADVENTISTS, an unincorporated association; General Conference Corporation of Seventh-day Adventists, a corporation; Potomac Conference of Seventh-day Adventists, an unincorporated association; Potomac Conference Corporation of Seventh-day Adventists, a corporation; Kenneth J. Mittleider; and James Londis; Appellees.**

**No. 84–1319.**

United States Court of Appeals, Fourth Circuit.

Argued March 4, 1985.

Decided Sept. 23, 1985.

Eileen M. Stein, Chevy Chase, Md., for appellant.

Walter E. Carson, Washington, D.C., Glenn E. Culpepper, Takoma Park, Md., (Johns & Carson, Washington, D.C., Gingerich and Culpepper, Takoma Park, Md., on brief), for appellees.

Before WINTER, Chief Judge, and SPROUSE and WILKINSON, Circuit Judges.

WILKINSON, Circuit Judge:

This case raises significant questions about the application of the civil rights laws to churches. The issue is whether a

woman denied a pastoral position in the Seventh-day Adventist Church may charge that church with sexual and racial discrimination under Title VII of the Civil Rights Act of 1964. The district court granted summary judgment to defendants on the grounds that the suit was barred by the religion clauses of the First Amendment. Because state scrutiny of the church's choice would infringe substantially on the church's free exercise of religion and would constitute impermissible government entanglement with church authority, we affirm the judgment of the district court.

## I

Carole Rayburn is a white female member of the Seventh-day Adventist Church who holds a Master of Divinity degree from Andrews University, the church's theological seminary, and a Ph.D. in psychology from Catholic University. In 1979 she applied to appellee Potomac Conference, an administrative body within the church, for an Associate in Pastoral Care internship. At about the same time, she applied for a vacancy on the pastoral staff of the Sligo Seventh-day Adventist Church, one of the denomination's largest with a congregation of five thousand people at the church's world headquarters in Takoma Park, Maryland.

Rayburn hoped by securing the internship to be assigned to the Sligo Church vacancy. The pastoral staff of Sligo Church consists of the senior pastor and six associate pastors. The position of associate pastor may be held by an ordained minister, a ministerial intern (a male who has received seminary training but has not been ordained), or an associate in pastoral care (a female who has received seminary training but has a different title from her male counterpart because in the Seventh-day Adventist Church women may not stand for ordination).

Both the Sligo vacancy as an associate in pastoral care and the Potomac Conference

internship were awarded to another woman. Upon learning of her rejection, Rayburn filed a complaint with the Equal Employment Opportunity Commission under Title VII of the Civil Rights Act of 1964, alleging discrimination on the basis of her sex, her association with black persons, her membership in black-oriented religious organizations, and her opposition to practices made unlawful by Title VII. After receiving a right-to-sue letter, she filed the present action against the Potomac Conference and its president, Kenneth Mittleider, the pastor of the Sligo Church, James Londis, and the General Conference of Seventh-day Adventists, the governing body of the church which must formally approve all applications recommended by local bodies such as the Potomac Conference.[1]

Limited discovery focused on the nature of an associateship in pastoral care. Undisputed evidence showed that the Sligo Church position entailed teaching baptismal and Bible classes, pastoring the singles group, occasional preaching at Sligo and other churches, and other evangelical, liturgical, and counselling responsibilities. An associate in pastoral care may also receive a "commissioned minister credential" or a "commissioned minister license," although, as stated, she may never be ordained.

Rayburn did submit some evidence to support her claims of sexual and racial discrimination, but the district court for the District of Maryland granted defendants' motions for summary judgment. The court ruled that the General Conference of the church should be dismissed as a defendant because it had no involvement with Rayburn's application. It held further that a Title VII suit was barred in this instance by the religion clauses of the First Amendment. Contending that selection of an associate in pastoral care is not exempt from Title VII, Rayburn brings this appeal.

## II

Before addressing the decision of the district court and the response of Rayburn,

---

1. The original complaint also named as defendants the General Conference Corporation of Seventh-day Adventists and the Potomac Conference Corporation of Seventh-day Adventists. Both entities were dismissed by consent of the parties prior to the district court's decision.

we must first determine whether Title VII and the First Amendment necessarily collide in this case. The Supreme Court has often noted that "if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *International Association of Machinists v. Street*, 367 U.S. 740, 749–50, 81 S.Ct. 1784, 1789–90, 6 L.Ed.2d 1141 (1961); *accord, Curtis v. Loether*, 415 U.S. 189, 192 n. 6, 94 S.Ct. 1005, 1007 n. 6, 39 L.Ed.2d 260 (1974); *Ashwander v. TVA*, 297 U.S. 288, 348, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). Such a construction is especially appropriate when a broader reading of the statute implicates the religion clauses of the First Amendment. In *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), the Court, discussing the National Labor Relations Board's jurisdiction over lay teachers in parochial schools under the National Labor Relations Act, stated:

In keeping with the Court's prudential policy it is incumbent on us to determine whether the Board's exercise of its jurisdiction here would give rise to serious constitutional questions. If so, we must first identify "the affirmative intention of the Congress clearly expressed" before concluding that the Act grants jurisdiction.

440 U.S. at 501, 99 S.Ct. at 1319, *quoting McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21–22, 83 S.Ct. 671, 677–78, 9 L.Ed.2d 547 (1963) (further citation omitted).

The application of Title VII to the employment relationship before us would definitely "give rise to serious constitutional questions." *See e.g. Serbian Eastern Orthodox Diocese for the United States and Canada v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952); *McClure v.*

*Salvation Army*, 460 F.2d 553 (5th Cir.) *cert. denied*, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972). Although we would prefer to avoid those questions, we do not believe that such a course is fairly open to us. The language and the legislative history of Title VII both indicate that the statute exempts religious institutions only to a narrow extent. Section 702 of Title VII, as amended, 42 U.S.C. § 2000e–1 (1982), provides:

This subchapter shall not apply ... to a religious corporation, association, educational institution, or society with respect to the employment of individuals *of a particular religion* to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities. (emphasis supplied).

The wording of § 702 may fairly be construed to prohibit some forms of state involvement in ecclesiastical decisions of employment. If, for example, a religious institution were to present "convincing evidence" that an employment practice favored members of one faith or denomination over another, "§ 702 deprives the EEOC of jurisdiction to investigate further to determine whether the religious discrimination was a pretext for some other form of discrimination." *EEOC v. Mississippi College*, 626 F.2d 477, 485 (5th Cir.1980).

While the language of § 702 makes clear that religious institutions may base relevant hiring decisions upon religious preferences, Title VII does not confer upon religious organizations a license to make those same decisions on the basis of race, sex, or national origin, *see EEOC v. Pacific Press Publishing Ass'n*, 676 F.2d 1272, 1277 (9th Cir.1982); *EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277, 282 (5th Cir.1981); *EEOC v. Mississippi College*, 626 F.2d at 484; *McClure v. Salvation Army*, 460 F.2d at 558.[2] The statutory exemption applies to one particular reason for employment decision—that based upon religious preference. It was

---

**2.** Here, of course, one member of the Seventh-day Adventist Church was selected over another

of that same faith for reasons appellant allege pertain to race and sex.

open to Congress to exempt from Title VII the religious employer, not simply one basis of employment, and Congress plainly did not.

The legislative history reinforces the plain meaning of the statutory text. The original Act passed by the House in 1964 excluded religious employers from coverage altogether, H.R.Rep. No. 914, 88th Cong., 1st Sess. (1964), *reprinted in* 1964 *U.S.Cong. & Admin.News*, 2355, 2391, 2402. The final version excluded such employers only with respect to discrimination based on religion, and then only with respect to persons hired to carry out the employer's "religious activities." P.L. 88–352, Title VII, § 702, 78 Stat. 255 (July 2, 1964), *reprinted in* 1964 *U.S.Cong. & Admin.News* 287, 304. In 1972 the statute was amended to delete the word "religious," P.L. 92–261 § 3, 86 Stat. 103 (March 24, 1972), but Congress specifically rejected proposals to broaden further the scope of the exemption. Subcommittee on Labor of the Committee on Labor and Public Welfare of the United States Senate, Legislative History of the Equal Employment Opportunity Act of 1972 (Comm.Print 1972), at 1229–1230, 1258–1260. To the contrary, the analysis pertaining to § 702 states clearly that "Such organizations remain subject to the provisions of Title VII with regard to race, color, sex or national origin." Section-by-Section Analysis of H.R. 1946, the Equal Employment Opportunity Act of 1972, *reprinted in id.* at 1844, 1845.

■ We cannot impose upon a statute a limiting construction where to do so would strain congressional intent. Given the wording of the statute and the history behind it, we conclude that Title VII, by "the affirmative intention of the Congress, clearly expressed," *Catholic Bishop*, 440 U.S. at 501, 99 S.Ct. at 1319, applies to the employment decision in this case. We must turn, therefore, to the constitutional questions.

### III

The "wall of separation" between church and state, *Everson v. Board of Education*, 330 U.S. 1, 16, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947) has become a "variable barrier," *Lemon v. Kurtzman*, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971), as Congress has enacted comprehensive legislation to achieve desirable goals.[3] Tensions have developed between our cardinal Constitutional principles of freedom of religion, on the one hand, and our national attempt to eradicate all forms of discrimination, on the other.[4]

Each person's right to believe as he wishes and to practice that belief according to the dictates of his conscience so long as he does not violate the personal rights of others, is fundamental to our system. *Sherbert v. Verner*, 374 U.S. 398, 402–03, 83 S.Ct. 1790, 1792–94, 10 L.Ed.2d 965 (1963). This basic freedom is guaranteed not only to individuals but also to churches in their collective capacities, which must have "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116, 73 S.Ct. 143, 154, 97 L.Ed. 120 (1952). Ecclesiastical decisions are generally inviolate; "civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law," *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713, 96 S.Ct. 2372, 2382, 49 L.Ed.2d 151 (1976). The right to choose ministers without government restriction underlies the well-being of religious community, *see Kedroff*,

**3.** *See* D. Laycock, Towards A General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy, 81 Columbia L.Rev. 1373 (1981), citing as examples the National Labor Relations Act, the Fair Labor Standards Act, the Civil Rights Act of 1964, and the Federal Unemployment Tax Act. *Id.* at 1373.

**4.** *See* B. Bagni, Discrimination in the Name of the Lord: A Critical Evaluation of Discrimination by Religious Organizations, 79 Columbia L.Rev. 1514 (1979).

344 U.S. at 116, 73 S.Ct. at 154, for perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines both to its own membership and to the world at large.[5]

Any attempt by government to restrict a church's free choice of its leaders thus constitutes a burden on the church's free exercise rights. We next inquire whether "there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause." *Wisconsin v. Yoder,* 406 U.S. 205, 214, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972); *see also Sherbert v. Verner,* 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963). It would, of course, be difficult to exaggerate the magnitude of the state's interest in assuring equal employment opportunities for all, regardless of race, sex, or national origin. There remains, then, for examination the decisive criterion developed by the Court in *Wisconsin v. Yoder* to resolve a free exercise question: a balancing of the burden on free exercise against the "impediment to ... [the state's] objectives that would flow from recognizing the claimed ... exemption." 406 U.S. at 205, 92 S.Ct. at 1526.

Here that balance weighs in favor of free exercise of religion. The role of an associate in pastoral care is so significant in the expression and realization of Seventh-day Adventist beliefs that state intervention in the appointment process would excessively inhibit religious liberty. The associate in pastoral care at Sligo Church is, according to undisputed evidence, pastoral advisor to the Sabbath School that introduces children to the life of the church. She also leads small congregational groups in Bible study. As counselor and as pastor to the singles group, the associate in pastoral care is once again a liaison between the church as an institution and those whom it would touch with its message. Such counseling requires sensitivity both to the human problems of the congregation and to the church's message of comfort in the face of those problems. Never are people more in need of spiritual leadership than when they turn to a pastor for help in dealing with their most difficult moments. Finally, the selection of the associate in pastoral care to stand on the platform during services, to lead out the congregation during the church's solemn rites, and to preach occasionally from the pulpit places the imprimatur of the church upon that person as a worthy spiritual leader to whom members may look for consultation, example, and guidance in their own lives and in the life of the congregation as a corporate body.

Any one of these functions so embodies the basic purpose of the religious institution that state scrutiny of the process for filling the position would raise constitutional problems; when all functions are combined, the burden of potential interference becomes extraordinary. This burden is not diminished by the fact that lay church members may on appropriate occasions be called upon to participate in one or more of these activities or to serve in similar capacities in teaching and counseling each other. Lay ministries, even in leadership roles within a congregation, do not compare to the institutional selection for hire of one member with special theological training to lead others.

The fact that an associate in pastoral care can never be an ordained minister in her church is likewise immaterial. The "ministerial exception" to Title VII first articulated in *McClure v. Salvation Army,* 460 F.2d 553 (5th Cir.), *cert. denied,* 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972), does not depend upon ordination but upon the function of the position, *EEOC v.*

---

**5.** The free exercise rights of an organized church may appear, upon occasion, to infringe upon the religious liberties of individual members. We discern no such litigable conflict here, however, for the Court in *Kedroff* and *Milivojevich* has warned of the dangers of interposing government between church and believer. No member of a church may claim, under the First Amendment, an enforceable right to be considered or accepted by the church hierarchy as a minister. The dissident or dissatisfied must, under *Milivojevich,* generally look elsewhere for resolution of such grievances.

*Southwestern Baptist Seminary*, 651 F.2d 277 (5th Cir.1981), *cert. denied*, 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982). "As a general rule, if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered 'clergy.'" Bagni, Discrimination in the Name of the Lord: A Critical Evaluation of Discrimination by Religious Organizations. 79 Columbia L.Rev. 1514, 1545 (1979). This approach necessarily requires a court to determine whether a position is important to the spiritual and pastoral mission of the church, *see Southwestern Seminary*, 651 F.2d at 283. In the instance before us, the evidence is simply overwhelming that it is.

While it is our duty to determine whether the position of associate in pastoral care is important to the spiritual mission of the Seventh-day Adventist Church, we may not then inquire whether the reason for Rayburn's rejection had some explicit grounding in theological belief. Emphasis on the role of an associate in pastoral care rather than the reasons for Rayburn's rejection underscores our constitutional concern for the unfettered right of the church to resolve certain questions. The fact that the Seventh-day Adventist Church does not ordain women, the asserted scriptural basis for that practice, and the influence or lack thereof of this restriction in Rayburn's case do not influence our analysis. In "quintessentially religious" matters, *Milivojevich*, 426 U.S. at 720, 96 S.Ct. at 2385, the free exercise clause of the First Amendment protects the act of a decision rather than a motivation behind it. In these sensitive areas, the state may no more require a minimum basis in doctrinal reasoning than it may supervise doctrinal content.

The magnitude of the free exercise burden need not always obscure the magnitude of the state's interest embodied in Title VII. In *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), the Supreme Court noted that "The state may justify an inroad on

religious liberty by showing that it is the least restrictive means of achieving some compelling state interest," but with the caveat from *Wisconsin v. Yoder*, 406 U.S. at 215, 92 S.Ct. at 1533, that nevertheless "only those interests of the highest order ... can overbalance legitimate claims to the free exercise of religion." 450 U.S. at 718, 101 S.Ct. at 1432. As Title VII is an interest of the highest order, courts have held that Title VII properly applied to the secular employment decisions of a religious institution, such as those relating to a secular teacher in a church-approved school, *EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir.1980), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981), or editorial secretary in a church publishing house, *EEOC v. Pacific Press Publishing Association*, 676 F.2d 1272 (9th Cir.1982). But courts must distinguish incidental burdens on free exercise in the service of a compelling state interest from burdens where the "inroad on religious liberty" is too substantial to be permissible. *Thomas v. Review Board*, 450 U.S. at 718, 101 S.Ct. at 1432. This case is of the latter sort: introduction of government standards to the selection of spiritual leaders would significantly, and perniciously, rearrange the relationship between church and state. While an unfettered church choice may create minimal infidelity to the objectives of Title VII, it provides maximum protection of the First Amendment right to the free exercise of religious beliefs. The balance of values thus weighs against Rayburn's suggestion that the government may question the decision of the Seventh-day Adventist Church to hire another candidate as an associate in pastoral care.

## IV

To subject church employment decisions of the nature we consider today to Title VII scrutiny would also give rise to "excessive government entanglement" with religious institutions prohibited by the establishment clause of the First Amendment, *Lemon v. Kurtzman*, 403 U.S. 602, 613, 91 S.Ct.

2105, 2111, 29 L.Ed.2d 745 (1971).[6] Under *Lemon,* entanglement is measured by the "character and purposes" of the institution affected, the nature of the benefit or burden imposed,[7] and the "resulting relationship between the government and the religious authority." 403 U.S. at 615, 91 S.Ct. at 2112.[8] These criteria require us to decline examination of the Seventh-day Adventist Church's decision here.

Appellant seeks to bring within the purview of Title VII the church itself, the institution with which the danger of entanglement is most sensitive. If the dangers of entanglement were severe with respect to parochial schools, *Aguilar v. Felton,* —— U.S. ——, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985); *Lemon, supra,* they are all the more serious with respect to the church itself. While schools may serve both secular and sectarian functions, the purpose of the church is fundamentally spiritual, and the danger of "interaction between church and state," *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 1364, 79 L.Ed.2d 604 (1984), is what the establishment clause protects against.

The application of Title VII to employment decisions of this nature would result in an intolerably close relationship between church and state both on a substantive and procedural level. On a substantive level, the unrefuted evidence from appellee Potomac Conference emphasized the importance of "spirituality" as an attribute of an associate in pastoral care and stated that in making an appointment, "The guidance of the Holy Spirit is always sought so that the one chosen can be God's appointed, as well as the one who has the support of his/her fellow churchmembers." It is axiomatic that the guidance of the state cannot substitute for that of the Holy Spirit and that a courtroom is not the place to review a church's determination of "God's appointed."

Moreover, the goals of a church in the selection of its spiritual leaders and of a governmental agency in the performance of its statutory mandate may not be the same. The Equal Employment Opportunity Commission may or may not share the values of any given church, whose highest priority is simply one of fidelity to its own beliefs and practices. The danger is that choices of clergy which conform to the preferences of public agencies may be favored over those which are neutral or opposed. The church's selection may at times result from preferences wholly impermissi-

**6.** *Lemon* proposes three tests for determining the validity of a statute under the establishment clause: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; ... finally, the statute must not foster 'an excessive government entanglement with religion.'" 403 U.S. at 612–13, 91 S.Ct. at 2111–12 (citations omitted). There is no question that Title VII meets the first two of these tests.

**7.** As the statutes under discussion in *Lemon* provided benefits to parochial schools, the Court stated its criteria only in positive terms, whereas here we consider a potential burden on a religious institution. We see no reason why the dangers of entanglement are diminished in the latter situation. The risk of entanglement is not limited to situations where there is state assistance or sponsorship of a religious institution. *Walz v. Tax Commission of the City of New York,* 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970) (either taxation or exemption of churches would raise questions of entanglement). The dangers of entanglement are posed where there exists a continuing close administrative relationship in core areas of faith that poses the possibility of secular approval granted or withheld from religious denominations. *NLRB v. Catholic Bishop of Chicago,* 440 U.S. at 502, 99 S.Ct. at 1319. While the administrative relationship here constitutes a burden on the religion—and hence implicates free exercise values—we think that the First Amendment is also independently concerned that "a comprehensive, discriminating, and continuing state surveillance will ... involve excessive and enduring entanglement between state and church." *Lemon v. Kurtzman,* 403 U.S. at 619, 91 S.Ct. at 2114; *Aguilar v. Felton,* —— U.S. ——, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985).

**8.** We recognize that the Court has recently indicated that the *Lemon* test is not necessarily the only appropriate means for deciding an establishment question. *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984). Nevertheless, the framework of that case seems well suited to questions which involve the relationship of government to religious institutions.

ble in the secular sphere.[9] Where goals differ, the temptation for state intrusion becomes apparent. But "[e]ven if government policy and church doctrine endorse the same broad goal, the church has a legitimate claim to autonomy in the elaboration and pursuit of that goal." Laycock, Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy, 81 Columbia L.Rev. 1373, 1399 (1981). Where the values of state and church clash or where there is a differing emphasis among priorities or as to means in an employment decision of a theological nature, the church is entitled to pursue its own path without concession to the views of a federal agency or commission. Bureaucratic suggestion in employment decisions of a pastoral character, in contravention of a church's own perception of its needs and purposes, would constitute unprecedented entanglement with religious authority and compromise the premise "that both religion and government can best work to achieve their lofty aims if each is left free of the other within its respective sphere." *McCollum v. Board of Education*, 333 U.S. 203, 212, 68 S.Ct. 461, 92 L.Ed. 649 (1948).

On a procedural level, entanglement might also result from a protracted legal process pitting church and state as adversaries in disregard of *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). "[P]ervasive monitoring by public authorities ... infringes precisely those Establishment Clause values at the root of the prohibition of excessive entanglement." *Aguilar v. Felton*, —— U.S. at ——, 105 S.Ct. at 3238. A Title VII action is potentially a lengthy proceeding, involving state agencies and commissions, the EEOC, the federal trial courts and courts of appeal. Church personnel and records would inevitably become subject to subpoena, discovery, cross-examination, the full panoply of legal process designed to probe the mind of the church in the selection of its ministers. The remedies that a district court may impose, 42 U.S.C. § 2000e–5(g) (1982), may be far-reaching in their impact upon religious organizations. Even after entry of judgment, questions of compliance may result in continued court surveillance of the church's policies and decisions. In *Catholic Bishop*, the Supreme Court, holding that church-operated schools were not subject to NLRB jurisdiction, noted that "It is not only the conclusions that may be reached by the Board which may infringe on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." 440 U.S. at 502, 99 S.Ct. at 1319. The same is true here. There is the danger that churches, wary of EEOC or judicial review of their decisions, might make them with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of their own personal and doctrinal assessments of who would best serve the pastoral needs of their members.

Of course churches are not—and should not be—above the law. Like any other person or organization, they may be held liable for their torts and upon their valid contracts. Their employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions. *See, e.g., EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir. 1980), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981) (Title VII could be applied to promotion of secular teacher in religious educational institution); *EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277 (5th Cir.1981), *cert. denied*, 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982) (Title VII applicable to administrative and support staff at a seminary); *EEOC v. Pacific Press Publishing Ass'n*, 676 F.2d 1272 (9th Cir.1982) (editorial secretary at church-affiliated publishing house); *Whitney v. Greater New York Corporation of Seventh-day Adventists*,

---

**9.** For example, some churches, like the Seventh-day Adventist, do not permit the ordination of women.

401 F.Supp. 1363 (S.D.N.Y.1975) (typist-receptionist). Without adopting or rejecting the specific rulings of such cases, we hold that the Constitution requires that civil authorities decline to review either the procedures for selection or the qualifications of those chosen or rejected here.

The decision of the district court is AFFIRMED.