UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DONALD E. CLAPPER,
<u>Plaintiff-Appellant,</u>

v.

CHESAPEAKE CONFERENCE OF
SEVENTH-DAY ADVENTISTS,

<u>Defendant-Appellee,</u>

No. 97-2648

and

LON GRUESEBECK; COLUMBIA
UNION OF SEVENTH-DAY ADVENTISTS,
<u>Defendants.</u>

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, District Judge.
(CA-95-832-WMN)

Argued: October 29, 1998

Decided: December 29, 1998

Before WILKINS, HAMILTON, and LUTTIG, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Thomas James Gagliardo, GAGLIARDO & ZIPIN, Sil-
ver Spring, Maryland, for Appellant. Paul D. Raschke, BOULAND &

BRUSH, L.L.C., Baltimore, Maryland, for Appellee. **ON BRIEF:** John E. Hilsman, GAGLIARDO & ZIPIN, Silver Spring, Maryland, for Appellant. H. Dean Bouland, Catherine C. Hester, BOULAND & BRUSH, L.L.C., Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Donald Clapper (Clapper), a former elementary school teacher at Mt. Aetna Academy in Hagerstown, Maryland, brought this civil action against his employer, the Chesapeake Conference of the Seventh-day Adventists (the Chesapeake Conference), alleging discriminatory discharge and discriminatory failure to transfer (1) on account of his age (fifty-nine) in violation of the Age Discrimination in Employment Act (ADEA), see 29 U.S.C.§ 623(a)(1), (2) on account of his race (Caucasian) in violation of Title VII of the Civil Rights Act of 1964, see 42 U.S.C. § 2000e-2(a)(1), and (3) in breach of his employment contract. Clapper now appeals the district court's grant of the Chesapeake Conference's alternative motions to dismiss his entire action for lack of subject matter jurisdiction or for summary judgment, and the district court's denial of his post-judgment motion for reconsideration. The district court granted the Chesapeake Conference's alternative motions on the ground that Clapper's action is barred by the First Amendment's Free Exercise of Religion Clause (the Free Exercise Clause), see U.S. Const. amend. I, and denied his motion for reconsideration as being without merit. For reasons that follow, we affirm.

I.

The Chesapeake Conference is the unit of the Seventh-day Adventist Church that operates, based on a traditional 180-day school year,

2

private religious elementary and secondary schools throughout most of Maryland and in some neighboring states. Among these schools is Mt. Aetna Academy, which offers education at the elementary school level. Specifically, Mt. Aetna Academy offers education from kindergarten through eighth grade.

The Chesapeake Conference operates its schools pursuant to a written education code (the Education Code), which is incorporated into all contracts between the Chesapeake Conference and the teachers in its employ. The schools have an express and avowedly sectarian purpose, which is most comprehensively expressed in the Education Code. Indeed, the following passages of the Education Code make clear that the Seventh-day Adventists consider the primary purpose of their elementary and secondary schools to be the salvation of each student's soul through his or her indoctrination in Seventh-day Adventist theological beliefs. Section 1013 of the Education Code provides:

> [t]he Seventh-day Adventist Church in North America operates a program of education, kindergarten through university, that began in 1872. The Church's belief regarding Christian education is based on the Scriptures and the writings of Ellen G. White[1] which have provided the Church with a distinct philosophy of education. . . .
>
> The aim of Seventh-day Adventist education is the redemption of each student.

(J.A. 260) (emphasis added). The Education Code elaborates on these pronouncements in § 1019:

> Seventh-day Adventists conduct their own schools, elementary through university, for the purpose of transmitting to their children their own ideals, beliefs, attitudes, values, habits and customs. The government maintains a highly developed public school system for making citizens; but in addition to being patriotic, law-abiding citizens, Seventh-

_____

[1] Ellen G. White was the founder of the Seventh-day Adventist Church.

3

day Adventists want their children to be loyal, conscientious Christians. There is peculiar to the Church a body of knowledge, values and ideals that must be transmitted to the younger generation so the Church may continue to exist. In this process the Biblical principle of social transmission is recognized: "Tell ye your children of it, and let your children tell their children, and their children another generation." (Joel 1:3).

(J.A. 261). Finally, the Education Code establishes at § 1028 that the Seventh-day Adventist School is the Church:

Criteria That Identifies the Seventh-day Adventist School as the Church:

1. The mission of the school and the Church are identical --redemption is the task. . . .

a. In studying the great commission, Matthew 28:18-20, the basic task of the Church is an educational task.

b. The Seventh-day Adventist school system has as its basic evangelistic task the redemption and education of the children and youth. In pursuing this task, it influences them more continuously than any other agency of the Church.

c. The Church operates a school system to ensure that its youth may receive a balanced physical, mental, moral, social and practical education. The primary aim of each Seventh-day Adventist educational institution is to reflect accurately and to uphold the principles of the Seventh-day Adventist Church. Seventh-day Adventist schools are to be an effective influence in the salvation of our youth and provide the workers for the world-wide task of the Church. The stated interest of the Church is the optimum development of the whole child for both this life and the life hereafter.

(J.A. 265) (emphasis added).

Per the Education Code, the avowed sectarian purpose of Seventh-day Adventist elementary schools is carried out through mandatory devotional periods at the beginning and close of each school day, mandatory witnessing and service activities, formal instruction in the teachings of the Bible according to Seventh-day Adventist theology on a daily basis, and incorporation of Seventh-day Adventist theological beliefs in the traditional academic curriculum. Two examples of incorporation of Seventh-day Adventist theological beliefs into the traditional academic curriculum are the teaching of the Bible's story of creation in science classes and the teaching of the influence of religion on the events of history in social studies classes. One full-time elementary school teacher per grade leads his or her students in these prayer, worshiping, witnessing, and service activities. The same teacher also performs the formal Bible instruction and teaches his or her students the traditional academic curriculum.

In accord with the avowed sectarian purpose of Seventh-day Adventist elementary schools, § 4010 of the Education Code requires that the beliefs and practices of every teacher employed by the Chesapeake Conference be in complete harmony with the beliefs and practices of the Seventh-day Adventist Church. Furthermore, pursuant to various sections of the Education Code, teachers at Seventh-day Adventist schools must be tithe paying members of the Seventh-day Adventist Church and are expected to participate in church activities, programs, and finances. They are also required to maintain a working knowledge of the Education Code and to read on an annual basis appropriate texts on religion.

In addition to leading students in prayer, formally instructing students in the teachings of the Bible according to Seventh-day Adventist theology, leading the students in witnessing and service activities, and otherwise imparting Seventh-day Adventist theology through the traditional academic curriculum, the Chesapeake Conference offers several examples of the ministerial nature of its full-time elementary school teaching positions. First, pursuant to the working policy of the North American Division of the General Conference of Seventh-day Adventists, a policy incumbent upon the Chesapeake Conference, up to thirty percent of a teacher's salary can be funded by Church tithes.

5

The primary purpose of Church tithes is to support an evangelistic ministry.[2] Second, the Seventh-day Adventist Church awards a "Commissioned Ministry of Teaching Credential" to its full-time elementary school teachers who, although they may not have undergone formal ministerial training, have demonstrated great experience and spiritual commitment to the Church. According to Clapper, this credential "was to somewhat put teachers on a ministerial standing in the church because of the role we played with leading students in their spiritual life . . . ." (J.A. 126-27). And third, the professional ethics section of the Education Code requires Seventh-day Adventist teachers to "[l]ook upon Christian teaching as a holy vocation." (J.A. 285).

Clapper emphasizes that of the thirteen general responsibilities of full-time elementary school teachers specifically listed in the Education Code, only one is explicitly religious--requiring teachers to provide a dynamic environment with emphasis on Christian living and effective learning--none are sacerdotal, and none involve church governance. Representative examples of the other twelve are establishing and maintaining effective classroom organization, assuming responsibility for professional self-improvement, participating in church and community services, and developing effective relationships with parents, patrons and colleagues. The Education Code provides that this list is not exclusive. Clapper also emphasizes that per the Education Code, the Chesapeake Conference has a policy of not discriminating in employment matters on the basis of race, national

_____

[2] The policy of using tithes for support of Seventh-day Adventist Schools is predicated on a statement made by Ellen G. White in about 1899, which is quoted in the Working Policy of the North American Division of the General Conference of Seventh-day Adventists: "Our conferences . . . should give the schools a most hearty and intelligent support. Light has been plainly given that those who minister in our schools, teaching the Word of God, explaining the Scriptures, educating the students in the things of God, should be supported by tithe money." (J.A. 251). Furthermore, according to the Working Policy of the North American Division of the General Conference, the reason for the thirty percent limit on the use of tithe funds to pay elementary school teachers' salaries is the belief that thirty percent represents "a reasonable basis on which to evaluate the time devoted by elementary teachers to Bible instruction and spiritual nurture." (J.A. 251).

origin, gender, color, age, marital status, disability or any other basis prohibited by law.

We now turn to the specifics of Clapper's employment with the Chesapeake Conference. The Chesapeake Conference employed Clapper through annual employment contracts as a full-time teacher at Mt. Aetna Academy at various grade levels from 1973 through the school year ending in May 1993. Throughout his teaching career at Mt. Aetna Academy, Clapper led his students in prayer in the morning, at lunch, at the end of the school day, and at any time throughout the day if a student made a special request for prayer. He also conducted worship each day with his students for approximately ten minutes. Furthermore, on a daily basis he taught Bible as a formal part of the school curriculum and Seventh-day Adventist theology when incorporated into the traditional academic curriculum. Moreover, as required by the Education Code, Clapper engaged his students in the practice of witnessing, which encourages them to apply their faith in a practical way.

In accord with the Education Code, while Clapper taught at Mt. Aetna Academy, he was an active, tithe-paying member of the Seventh-day Adventist Church. On January 20, 1991, the Chesapeake Conference awarded Clapper a Commissioned Ministry of Teaching Credential. Furthermore, thirty percent of Clapper's salary came from Seventh-day Adventist Church tithes.

In March 1993, by letter the Chesapeake Conference notified Clapper, who was fifty-nine years old at the time, that his contract would not be renewed for the 1993-1994 school year. The letter cited two reasons for the nonrenewal--insufficient enrollment and lack of funds needed to support the present number of teachers currently employed at Mt. Aetna Academy. By way of an affidavit of the Superintendent of Schools of the Chesapeake Conference, Lon Gruesebeck, the Chesapeake Conference also cites a history of performance problems and complaints from parents and students as additional factors motivating its decision not to renew Clapper's contract. The record contains negative teacher evaluations of Clapper by former students, parents, and the principal of Mt. Aetna Academy.

Clapper subsequently filed the present action in which he primarily alleges that the Chesapeake Conference's decisions not to renew his

full-time teaching contract for the 1993-1994 school year at Mt. Aetna Academy, or transfer him to another elementary school within its jurisdiction, violated his rights under Title VII, see 42 U.S.C. § 2000e--2(a)(1), and the ADEA, see 29 U.S.C. § 623(a)(1), and amounted to a breach of his employment contract. Clapper also alleges that the Chesapeake Conference's failure to offer him the part-time position at Mt. Aetna Academy of music instructor/school librarian for the 1993-1994 school year violated his rights under Title VII and the ADEA, and amounted to a breach of his employment contract.

Prior to discovery, the Chesapeake Conference moved to dismiss Clapper's action pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief could be granted, and alternatively moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. The district court denied the alternative motions, but granted the Chesapeake Conference leave to renew them at the close of discovery.

At the close of discovery, the Chesapeake Conference moved to dismiss Clapper's action pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction on the ground that continued enforcement of Clapper's action would violate its rights under the Free Exercise Clause and the Establishment Clause of the First Amendment. The Chesapeake Conference alternatively moved for summary judgment based on the same grounds. The alternative motions did not challenge any of Clapper's claims on the merits.

Agreeing with the Chesapeake Conference that continued enforcement of Clapper's action would violate its rights under the Free Exercise Clause, the district court granted the Chesapeake Conference's alternative motions without addressing whether the Establishment Clause required dismissal also. Clapper sought reconsideration of the district court's decision by motion, apparently pursuant to Federal Rule of Civil Procedure 59(e), purportedly to correct an error of law and to account for the information contained in an affidavit prepared by himself after the district court dismissed his action. In that affidavit, Clapper attempts to downplay the ministerial nature of his former teaching positions at Mt. Aetna Academy by asserting that the time he spent instructing his students in Bible and leading them in worship

constituted only 10.6 percent of his work week. Clapper also speculated that the Commissioned Ministry of Teaching Credential was created to immunize the Seventh-day Adventist Church from lawsuits. Finally, Clapper asserted, based upon his layman's review of certain financial documents, that none of his salary was funded by tithe funds.

The district court denied Clapper's Rule 59(e) motion on the grounds that it had already considered and rejected Clapper's legal arguments and the characterization of his employment in his affidavit was untimely and "wholly inconsistent with the view he previously expressed in this litigation regarding the religious nature of his position." (J.A. 80). This appeal followed.

II.

In order to properly analyze the merits of the district court's grant of the Chesapeake Conference's alternative motions to dismiss for lack of subject matter jurisdiction or for summary judgment, we must first consider the propriety of the district court's denial of Clapper's Rule 59(e) motion to the extent Clapper premised it upon the information in his attached affidavit. This is because we need to know whether to consider or refrain from considering the information contained in Clapper's affidavit in our review of the propriety of the district court's granting of the alternative motions.

Rule 59(e) provides that an aggrieved party may file a motion to alter or amend a judgment within ten days of its entry. Although Rule 59(e) does not itself provide any standard for when the grant of such a motion is appropriate, this court has recognized three alternative grounds: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." Pacific Ins. Co. v. American Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998). "The Rule 59(e) motion may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." 11 Wright, Miller, and Kane, Federal Practice and Procedure § 2810.1, at 127-28 (2d ed. 1995) (footnotes omitted). We review a district court's refusal to grant a

9

Rule 59(e) motion for abuse of discretion. See Pacific Ins. Co., 148 F.3d at 403.

Here, all of the information presented in Clapper's affidavit could have been presented prior to the district court's ruling on the alternative motions. Accordingly, the district court did not abuse its discretion by denying Clapper's motion to the extent he premised it upon the information contained in his attached affidavit. We, therefore, will not consider any of the information in our analysis of the merits of the district court's grant of the Chesapeake Conference's alternative motions to dismiss and for summary judgment.

III.

We now address the propriety of the district court's dismissal of Clapper's action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). The existence of subject matter jurisdiction is a legal question, which we review de novo. See Yarnevic v. Brink's, Inc., 102 F.3d 753, 754 (4th Cir. 1996).

The district court below concluded that continued maintenance of Clapper's action would violate the Chesapeake Conference's rights to the free exercise of religion as guaranteed by the First Amendment's Free Exercise Clause, and therefore, Clapper's action had to be dismissed. The Free Exercise Clause, which is applicable to the States through the Fourteenth Amendment, see Cantwell v. Connecticut, 310 U.S. 296, 303 (1940), provides that "Congress shall make no law . . . prohibiting the free exercise of" religion. U.S. Const. amend. I. In accord with this prohibition, "decisions of religious entities about the appointment and removal of ministers and persons in other positions of similar theological significance are beyond the ken of civil courts." Bell v. Presbyterian Church (U.S.A.), 126 F.3d 328, 331 (4th Cir. 1997); see also E.E.O.C. v. Catholic University of America, 83 F.3d 455, 461 (D.C. Cir. 1996). This litigation bar applies in the context of state common law and federal statutory causes of action. See Bell, 126 F.3d at 330 (claims for interference with contract; intentional infliction of emotional distress; breach of covenant of good faith and fair dealing; interference with prospective advantage; and wrongful termination); Minker v. Baltimore Annual Conference of the United Methodist Church, 894 F.2d 1354, 1358 (D.C. Cir. 1990) (ADEA

10

claim); <u>Rayburn v. General Conference of Seventh-day Adventists</u>, 772 F.2d 1164, 1165 (4th Cir. 1985) (Title VII claims).

Here, we first consider whether the Free Exercise Clause required dismissal of Clapper's Title VII, ADEA, and state common law breach of contract claims challenging the Chesapeake Conference's decisions not to renew his teaching contract at Mt. Aetna Academy for the 1993-1994 school year or transfer him to another elementary school within its jurisdiction. Whether the Free Exercise Clause required dismissal "does not depend upon ordination but upon the function of the position . . ." at issue. <u>Rayburn</u>, 772 F.2d at 1168. "As a general rule, if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered clergy." <u>Id.</u> at 1169 (internal quotation marks omitted). The parties refer to this inquiry as the "primary duties test."

The primary duties test "necessarily requires a court to determine whether a position is important to the spiritual and pastoral mission of the church." <u>Id.</u> Furthermore, while it is our duty to determine whether the position of a full-time elementary school teacher is important to the spiritual mission of the Seventh-day Adventist Church, we may not further inquire whether the reasons for the Chesapeake Conference's decisions not to renew Clapper's contract for the 1993-1994 school year at Mt. Aetna Academy, or transfer him to another elementary school within its jurisdiction, had some explicit grounding in theological belief. <u>See id.</u> This is because "[i]n quintessentially religious matters, the free exercise clause of the First Amendment protects the act of a decision rather than the motivation behind it. In these sensitive areas, the state may no more require a minimum basis in doctrinal reasoning than it may supervise doctrinal intent." <u>Id.</u> (internal quotation marks and citation omitted).

Clapper contends that application of the primary duties test results in the conclusion that the Free Exercise Clause does not bar his claims challenging the Chesapeake Conference's decisions not to renew his contract to teach at Mt. Aetna Academy for the 1993-1994 school year or transfer him to another elementary school within its jurisdiction. Clapper largely relies upon three factual circumstances in sup-

11

port of his contention. First, Clapper relies upon the fact that of the thirteen general responsibilities of full-time elementary school teachers listed in the Education Code, only one is explicitly religious, none are sacerdotal and none involve church governance. Second, he relies upon the Seventh-day Adventist Church's thirty-percent limit on the use of tithe funds to pay teachers' salaries. Because the primary purpose of tithe funds is to support the evangelistic ministry of the Seventh-day Adventist Church, Clapper posits that at most thirty percent of full-time teachers' duties at elementary schools operated by the Chesapeake Conference can be considered to involve teaching and spreading the faith and/or supervision or participation in religious ritual and worship. Third and finally, Clapper relies upon the Chesapeake Conference's policy against making employment decisions because of race, national origin, gender, color, age, marital status, disability or any other basis prohibited by law as indicia of its acceptance of secular intervention in its employment decisions.

After considering the uncontradicted evidence in this case, we conclude the primary duties of full-time teachers at elementary schools operated by the Chesapeake Conference consist of teaching and spreading the Seventh-day Adventist faith and supervising and participating in religious ritual and worship. As set forth previously, the Education Code of the Chesapeake Conference makes abundantly clear in several provisions that the primary purpose of Seventh-day Adventist elementary education is the redemption of each student's soul through his or her belief and faithful adherence to Seventh-day Adventist theological beliefs, i.e., propagation of the Seventh-day Adventist faith. Nothing in the record suggests the Chesapeake Conference actually operated or continues to operate its elementary schools for a different primary purpose. Furthermore, the Education Code makes clear that in pursuing this primary purpose, the Seventh-day Adventist school system "influences" the youth of the Seventh-day Adventist Church "more continuously than any other agency of the church." (J.A. 265). Not surprisingly, therefore, the Seventh-day Adventist Church relies heavily upon its full-time, elementary school teachers to carry out its sectarian purpose. In light of this reliance, it is understandable that the Chesapeake Conference requires all of its full-time, elementary school teachers to exemplify the teachings of the Seventh-day Adventist faith in their personal and professional lives. The purpose of this requirement is obvious--the Chesapeake

12

Conference desires to insure that the minds of its youth are shaped by model members of the Seventh-day Adventist faith. **3** When all of these circumstances are considered in combination with the fact that on a daily basis for at least 180-days per year, these teachers formally instruct their students in the teachings of the Bible as understood by the Seventh-day Adventist Church, teach the traditional academic curriculum, which incorporates the teachings of the Seventh-day Adventist Church whenever possible, lead their students in prayer at various times during the day, lead their students in worship at the beginning of the day for about ten minutes, and lead their students in witnessing activities, we are constrained to conclude that the primary duties test is satisfied.

The factual circumstances relied upon by Clapper do not alter our analysis. First, the fact that only one of the thirteen general responsibilities listed in the Education Code is explicitly religious is of no moment, because nothing in the Education Code suggests that the differing general responsibilities are considered of equal importance and the Education Code expressly states that the list is not exhaustive.

Second, the fact that only thirty-percent of a teacher's salary can be paid with tithe funds is of little relevance. Clapper's reliance upon this factual circumstance incorrectly limits the primary duties test to a purely quantitative test rather than one that obviously has both quantitative and qualitative elements. What is of constitutional significance is whether, in the total mix of circumstances, enforcement of Clapper's action would substantially infringe upon the Chesapeake Conference's right to choose its spiritual leaders. While the relative quantity of time an employee of a religious entity spends directly teaching and spreading the faith, providing church governance, supervising a religious order, or supervising or participating in religious ritual and worship is important in determining whether those activities are the primary duties of such employee, the degree of the church entity's reliance upon such employee to indoctrinate persons in its theology is equally important. And, for the reasons previously set forth, the quantitative and qualitative combination of factual circum-

_____

**3** Indeed, in the case of Clapper, that the Chesapeake Conference considered him a spiritual leader of his students is partly evidenced by the fact that thirty percent of his salary came from tithe funds.

13

stances in the present case compels us to conclude that the primary duties test is satisfied.**4**

Third, the fact that the Chesapeake Conference follows an internal policy of not basing employment decisions on otherwise legally prohibited reasons does not in any way indicate its acceptance of secular intervention in its employment decisions. Nothing in the Education Code suggests otherwise.

In sum, with respect to Clapper's claims involving a full-time teaching position at Mt. Aetna or another elementary school within the Chesapeake Conference's jurisdiction, we hold the district court did not err in granting the Chesapeake Conference's Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. The motion was properly granted because continued enforcement of these claims would substantially infringe upon the Chesapeake Conference's rights to freely exercise its religion as guaranteed by the First Amendment's Free Exercise Clause. We caution, however, that the primary duties test is a very fact specific test, and therefore, our holding today is limited to the facts before us.

IV.

In light of our holding, we, like the district court, do not consider whether the First Amendment's Establishment Clause would also require dismissal of Clapper's claims involving a full-time teaching position at Mt. Aetna or another elementary school within the Chesa-

_____

**4** The record contains insufficient information regarding the specific duties of the position of part-time music teacher/librarian at Mt. Aetna Academy for us to conclude the Free Exercise Clause also required dismissal of Clapper's claims related to this position. Nevertheless, we affirm the district court's grant of the Chesapeake Conference's alternative motion for summary judgment with respect to Clapper's claims related to this position, because the undisputed evidence establishes that the Chesapeake Conference did not have any role in the decision not to place Clapper in that position for the 1993-1994 school year. Rather, the undisputed evidence establishes that the principal of Mt. Aetna Academy alone had discretion to make the decision, made the decision, and funded the position with discretionary funds at his disposal as principal.

peake Conference's jurisdiction. Furthermore, having concluded that dismissal of these claims under Rule 12(b)(1) for lack of subject matter jurisdiction was proper, we do not consider whether the district court's alternative grant of summary judgment in favor of the Chesapeake Conference with respect to these claims was proper. Finally, in light of our other holdings, we hold the district court did not abuse its discretion in any manner in denying Clapper's Rule 59(e) motion. The judgment of the district court is, accordingly, affirmed.

AFFIRMED

15