290 N.J. Super. 616 (1996)
676 A.2d 580
EILEEN GALLO, PLAINTIFF-APPELLANT, CROSS-RESPONDENT,
v.
SALESIAN SOCIETY, INC., T/A DON BOSCO HIGH SCHOOL, AND JAMES M. SCANLON, DEFENDANTS-RESPONDENTS, CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued April 3, 1996.
Decided May 17, 1996.
*622 Before Judges KING, LANDAU and HUMPHREYS.
Kenneth Gallo argued the cause for appellants (Gallo and Gallo, attorneys).
Anad Agneshwar argued the cause for respondents (McCarter & English, attorneys; Rosemary Alito, of counsel).
William H. Lorentz, Deputy Attorney General, argued the cause for amicus curiae Division on Civil Rights (Deborah T. Poritz, Attorney General of New Jersey, attorney; Alexander P. Waugh, Jr., Executive Assistant Attorney General, and Andrea M. Silkowitz, Assistant Attorney General, of counsel).
Nadine Taub argued the cause for amici curiae The American Civil Liberties Union of New Jersey and The Women's Rights Litigation Clinic.
The opinion of the court was delivered by KING, P.J.A.D.

I.
Plaintiff Eileen Gallo was employed by defendant Salesian Society, Inc. to teach English and history at Don Bosco High School, a private, all-boys parochial school in Ramsey, owned and operated by the defendant Society since 1915. Defendant James M. Scanlon was the school's principal. After plaintiff's employment was terminated in 1991 she sued for damages for age and sex discrimination. The jury found in her favor and awarded $24,000 in stipulated economic damages but nothing for emotional distress.
Plaintiff appeals from the amount of her attorney's fee award, $48,750, claiming that the judge arbitrarily reduced the hours expended, improperly considered the low verdict, and erred in refusing to increase the fee to compensate for its contingent nature. Plaintiff also claims error in denial of costs and prejudgment interest.
*623 Defendants cross-appeal from the denial of their motions to dismiss the claim on First Amendment grounds. They claim that enforcement of the Law Against Discrimination against them violates their First Amendment rights under the Establishment and Free Exercise Clauses of the United States Constitution. Defendants also argue that N.J.S.A. 18A:6-6, allowing single-sex schools to have single-sex faculties, permits a gender preference, and that plaintiff's failure to pursue her contractual grievance procedure requires dismissal of her claim.
We find no error and affirm on the appeal and cross-appeal, except on the plaintiff's claim for costs and prejudgment interest. On those points plaintiff is correct and we reverse.

II.
Plaintiff filed this complaint on October 29, 1991 alleging that she was employed by defendant as a teacher from 1983 until her termination in June 1991 and that she performed her duties in a professional and competent manner. She claimed defendants' explanation that her position was eliminated due to budgetary constraints was a pretext for discrimination because of her age (53) and sex in violation of N.J.S.A. 10:5-12. Plaintiff asserted that defendants hired a young man to perform substantially the same teaching duties. Plaintiff also unsuccessfully claimed that defendant violated an implied contract of continued employment, based on personnel policies and oral representations, and made other claims not pertinent to this appeal.
On July 24, 1992 defendants moved for summary judgment on all of plaintiff's claims, arguing, in part, that the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42, as applied to religious schools, violates the Establishment Clause of U.S. Const. amend. I, "in that it fosters excessive entanglement between religion and government." In support of their motion, defendants submitted an affidavit and a certification of Principal Scanlon; an affidavit of Father Timothy Ploch, a Roman Catholic priest and a leader of defendant Salesian Society, involved with the school's *624 management; the school's statement of philosophy; its personnel policies; and its 1990-91 contract with plaintiff.
Scanlon, a teacher at Don Bosco since 1966 and its principal since 1986, explained that the principal "has the final decision-making authority in the hiring and firing of teachers." In the 1990-91 school year, there were forty-one faculty members, including nine Salesian "priests/brothers," sixteen lay men, and eight lay women. Scanlon described a declining enrollment of 800 students in 1982 but only 692 in 1992. He explained that the school paid its own operating expenses from tuition and provided only the living expenses of the priests and brothers who lived on campus.
On April 15, 1991 Scanlon wrote to plaintiff advising her that, because of budget problems, he could not offer her a contract for the 1991-92 school year "at this time." "It is my hope that budgeting and scheduling matters for school year 1991-92 will be resolved in early May. Meanwhile, I ask for your patience and understanding."
Father Ploch, who held the position of Provincial, the highest post in this area's Province of the Salesian Society, explained that Reverend Kenneth McAlice, a teacher at Don Bosco, had requested and was granted a sabbatical in June 1991. Scanlon requested a replacement "from among the Salesian community so that there would not be an adverse impact on the budget for teacher salaries for the upcoming school year." Father Ploch said that he tried but could not find a Salesian replacement for Father McAlice and in late August 1991 advised Scanlon that "he would have to hire a lay person for that purpose." The facts pertinent to the hiring of the lay person were not described in the summary judgment affidavits but Scanlon testified at trial that he advertised for the position, interviewed candidates, and finally hired Brian Plunkett to teach English and history.
The statement entitled "The philosophy of Don Bosco Preparatory High School," distributed to parents of prospective students, provided in part:

*625 A primary purpose of the educational program at Don Bosco lies in our dedication to the education of the total person through a Catholic philosophy of life. This philosophy endorses man's origin from God and his return to God through a sincere endeavor to cooperate with God's divine plan of individual salvation.
....
From the inception, Don Bosco Preparatory High School has been profoundly influenced by the system of education proposed and developed by the renowned 19th century educator, St. John Bosco. The system is called the PREVENTIVE SYSTEM, and it emphasizes REASON, RELIGION, and KINDNESS as the fundamental elements essential to the process of educating youth. The faculty of Don Bosco is committed to the implementation of his approach to education....
Thus, it is the intention of Don Bosco Preparatory High School to provide the students with an education which promotes and fosters interest in an understanding of the Catholic Church and their personal role therein, which ignites a lifelong commitment to intellectual pursuits, and which acknowledges and understands the concept of individual differences....
The guide to hiring teachers, "Characteristics of Teachers in Catholic Schools," provided in part:
1. The teacher understands and accepts the fact that the schools are operated in accordance with the philosophy of Catholic education.
2. The teacher accepts and supports the ongoing building and living of a Faith Community, not simply as a concept to be taught but as a reality to be lived in worship, service, and interpersonal relationships.
....
4. The teacher reflects in his personal and professional life a commitment to Gospel values and the Christian tradition.
5. The teacher acknowledges that faith commitment is a free gift of God that is both relational and intellectual.
6. The teacher accepts the responsibility for providing an atmosphere for fostering the development of a faith commitment by the students.
....
14. The teacher relates to the students in an adult Christian manner and contributes to the student's sense of self-worth as a Christian person.
....
17. The teacher fosters the apostolic consciousness of students by encouraging them to join in experiential learning activities that give witness to Christian justice and love.
18. The teacher motivates and guides the students in acquiring skills, virtues and habits of heart and mind required to address with Christian insight the multiple problems of injustice which face individuals and our pluralistic society.
....
*626 Father Ploch testified at trial that Don Bosco Prep had teachers who were not Catholic. He said that profession and practice of the Catholic faith was not a qualification for employment.
In her "teacher contract" plaintiff agreed to "exemplify Christian principles and ideals in ... her teaching and in performance of all duties assigned to the Teacher by the School." Scanlon also explained that each teacher "is expected to begin each class with a prayer." The "teacher contract" further required plaintiff to "comply with and fully abide by ... [the] Policies on Personnel adopted by the School, which are hereby made part of this contract." Defendants' "Policies on Personnel" set forth a grievance procedure:
a. Any grievance a teacher has with the school should be expedited as soon as possible.
b. The normal order of appeal is as follows:
1) the Department Chairman, Dean, etc., as applicable;
2) the Principal
3) the Director
4) a fact-finding board made up of two faculty members of the teacher's choice and two other faculty members selected by the Director;
5) the School Board;
6) the Provincial Director of Education.
The defendants' policy also prohibited reprisals, provided for a separate grievance file for all documents, and required that grievance proceedings be conducted in private.
Judge Stark heard oral argument on October 16, 1992 and denied defendants' motion to dismiss plaintiff's sex and age discrimination claims and her implied contract claim but dismissed other claims not here relevant. Judge Stark rejected defendants' constitutional argument, citing Welter v. Seton Hall Univ., 128 N.J. 279, 608 A.2d 206 (1992), because plaintiff's teaching was "a [non]ministerial duty performed by a lay person with no overtones of ... religious precepts."
On March 2, 1993 plaintiff moved for summary judgment dismissing all of defendants' affirmative defenses, and on March 15, 1993 plaintiff moved to compel production of documents, including *627 other faculty members' evaluations, and letters of reprimand. On March 22, 1993 defendants cross-moved for summary judgment on plaintiff's sex discrimination and contract claims, arguing that N.J.S.A. 18A:6-6 barred the former, and plaintiff's failure to pursue internal grievance procedures barred the latter. On April 2, 1993 defendants opposed plaintiff's request for discovery and moved for a protective order, requiring plaintiff and her attorney "to keep information provided to them in discovery concerning the confidential files of defendants' employees in the strictest confidence."
To establish that Don Bosco was supported in part by public funds and covered by N.J.S.A. 18A:6-6, defendants submitted an affidavit of the current principal, Father John Connolly, explaining that the Ramsey Board of Education assisted in the purchase of educational materials and funding in-service teacher training. In addition, many students were transported at public expense, and the County of Bergen provided nursing services and equipment.
Judge Stark heard oral argument on the motions and cross-motions on April 16, 1993. She rejected the N.J.S.A. 18A:6-6 defense because subsequent case law "either directly overrules it or certainly undermines its [efficacy]." Noting that "gender is now a protected class on the Federal level as well as on the state level," the judge also concluded that there was "no compelling interest" in having a men-only faculty at any school.
The judge denied both the motion and cross-motion as to the grievance procedure, holding that plaintiff was not required to follow it when pursuing a "constitutional" claim. On the contract claim, regarding the grievance procedure, the judge found existing fact issues on "how ... the parties operate[d]" and "how the school operated with regard to others in similar situations." The judge granted plaintiff's discovery motion, limiting discovery to the eight years plaintiff was employed by defendant, excluded personnel records of nuns and priests from the scope of discovery, and granted the defendants' request for a protective order against dissemination of materials.
*628 Defendants moved for leave to appeal from these rulings, arguing that (1) N.J.S.A. 18A:6-6 barred plaintiff's sex discrimination claim; (2) all communications between a religious school and its lay religion teachers were protected by the First Amendment and were not discoverable; and (3) plaintiff's failure to follow the grievance procedure barred her contract claim. We denied the motion. Defendants' motion for leave to appeal to the New Jersey Supreme Court was denied on September 23, 1993.
The matter was tried before Judge Lucchi and a jury from February 14 to March 7, 1994. The jury found that plaintiff "proved by a preponderance of the evidence that she was performing her job at a level which satisfied the employer's reasonable expectations." They also found that "defendants' reasons for not offering her a renewal contract at the end of the school year 1990-91 were a pretext for unlawful discrimination against her" because of both age and sex. The jury awarded plaintiff $24,000, the stipulated economic damages for her lost earnings, after mitigation. The jury denied any award for non-economic damages.
On March 24, 1994 plaintiff moved for an order requiring defendants to pay her counsel fees. Her attorney certified that plaintiff had not paid him any fee; that his fee was contingent on a favorable verdict; and that he had agreed to accept the amount awarded by the court as payment in full. Counsel explained that he had been practicing law for thirty-six years and had extensive experience in litigation. He annexed detailed time records showing that he had spent over 335 hours on this case over two years. He asserted that the issues raised were novel and difficult, involving the liability of the Roman Catholic Church and required the skill of an experienced attorney. He also asserted that success could not be measured in dollars alone, and that the finding of liability of a religious organization was "a landmark in the discrimination law." He stressed the public interest in eradicating discrimination; the developing area of law in discrimination cases; and the difficulty in proving that defendants' decision was based on plaintiff's age and sex. With $275 per hour as his customary *629 fee, for 335 hours he requested $92,125. Counsel also submitted time records for his associate, Kenneth T. Gallo, totalling over 100 hours. He requested $125 per hour for his associate, totaling $12,500.
Defendants opposed the application for counsel fees and moved for a judgment notwithstanding the verdict, arguing that the LAD, as applied to defendant, violated the Establishment Clause of the First Amendment, since it "fosters excessive entanglement between religion and government." Defendants also renewed their argument under N.J.S.A. 18A:6-6. Judge Lucchi declined to consider defendants' arguments under the First Amendment and N.J.S.A. 18A:6-6, since Judge Stark's pretrial rulings on these issues were the "law of the case" and could not be disturbed.
Regarding plaintiff's application for attorney's fees, the judge found that plaintiff was the prevailing party and entitled to an award of a reasonable fee under N.J.S.A. 10:5-27.1. The judge "characterized" plaintiff's "overall success" as "good," noting that although she proved her discrimination claims, she did not obtain the substantial damages for emotional distress which she sought. The judge determined that the attorney's time spent pursuing the emotional distress claim, as well as other claims dismissed before trial, was not subject to a fee award. "Distinguishing the number of hours expended on Plaintiff's substantive age and sex discrimination case, on which she actually succeeded, from time expended in pursuit of non-economic damages is hampered by a lack of specificity in the attorney's time keeping practices." The judge thus determined the amount of the attorney's time "reasonably attributable to those claims on which plaintiff prevailed."
Acknowledging that the fee award need not "be proportionate to the amount of damages that the plaintiff has recovered," the judge found counsel's claim excessive. He lowered the hourly rates to $200 per hour for Louis Gallo and $100 per hour for his associate, Kenneth Gallo. He allowed Louis Gallo 207.25 hours, and Kenneth 73 hours, "[b]ased upon a careful review of the certifications" and their "lack of specificity." He awarded $41,450 for Louis *630 Gallo and $7,300 for Kenneth Gallo, totaling $48,750 as the lodestar amount. He declined to reduce the amount further due to "limited success" because he had already excluded hours not reasonably expended. He also declined to enhance the award because of contingency, although "authorized by relevant law," stating that this decision "lies solely at the discretion of the judge." He refused to award prejudgment interest. Finally, he declined to award costs, because of plaintiff's "incomplete success." Plaintiff's appeal and defendants' cross-appeal ensued.

III.
We first consider defendants' claim on the cross-appeal that because Don Bosco is a religious school, application of the LAD violates the Free Exercise and Establishment of Religion Clauses of the First Amendment of the United States Constitution. The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." N.J.S.A. 10:5-12 provides: "It shall be ... an unlawful discrimination: (a) For an employer, because of ... age [or] ... sex ... of any individual ... to discharge ... from employment such individual...."
Defendants contend that Judge Stark erred in denying their motion for summary judgment. R. 4:46-2. Our Supreme Court has recently clarified the summary judgment rule, requiring "the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life, 142 N.J. 520, 540, 666 A.2d 146 (1995). This standard is applicable to all pending cases. Id. at 545-46, 666 A.2d 146.
Defendants argue that plaintiff's function as a teacher at Don Bosco was ministerial and that the Free Exercise Clause prohibits any judicial involvement in this church-ministerial employment relationship. Defendants urge that even if plaintiff's job was non-ministerial, *631 the judicial inquiry into the employment relationship constituted excessive entanglement with religion, prohibited by the Establishment Clause.

THE FREE EXERCISE CLAUSE
Welter v. Seton Hall University, supra, involved an analogous situation. In Welter, plaintiffs were computer science teachers at a Catholic university who sought to enforce their contractual rights when they were terminated. 128 N.J. at 284, 608 A.2d 206. Plaintiffs were Ursuline nuns whose religious order refused to grant them permission to remain employed at the University. Id. at 288-89, 608 A.2d 206. The University relied on plaintiff's status as Catholic clerics and claimed that "when an employment duty owed to a cleric by a religious institution of the same faith conflicts with a religious command, the First Amendment forbids courts from adjudicating the dispute" and mandates abstention. Id. at 290-91, 608 A.2d 206. The Court rejected this argument, explaining:
Only when the underlying dispute turns on doctrine or polity should courts abdicate their duty to enforce secular rights. Judicial deference beyond that demarcation would transform our courts into rubber stamps invariably favoring a religious institution's decision regarding even primarily secular disputes. We reject the notion that an employee's status as a cleric within a religious organization, standing alone, justifies judicial abstention from enforcement of rights in job security, which this Court has previously recognized as important.
[Id. at 293-94, 608 A.2d 206 (citations omitted).]
The Court in Welter observed that Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-1, exempts a religious institution's employment decisions regarding individuals of a particular religion performing work connected with the institution's activities. 128 N.J. at 294, 608 A.2d 206.[1] Federal courts applying this exemption have used the "ministerial-function" test. Ibid.

*632 Under that test, if the employee's responsibilities transform the employee into a liaison between the religion and its adherents or if the "employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship," the First Amendment precludes judicial resolution of the dispute.
[Id. at 294-95, 608 A.2d 206, (quoting Rayburn v. General Conference of Seventh-day Adventists, 772 F.2d 1164, 1168-69 (4th Cir.1985), cert. denied, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986)).]
Our Court thus disapproved of judicial interference with a religious institution's choice of who would propagate the faith, train others to propagate the faith, or function as an intermediary between the institution and its faithful adherents. Without the consent of both parties, "jurisdiction over disputes involving an employee of a religious institution who performs ministerial functions would entail unconstitutional judicial entanglement in polity." Ibid.
However, the Court in Welter found that "plaintiffs performed no ministerial duties for Seton Hall." Id. at 298, 608 A.2d 206. "The mere fact that the `faculty members are expected to serve as exemplars of practicing Christians does not ... make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern.'" Ibid. (quoting Equal Employment Opportunity Comm'n v. Mississippi College, 626 F.2d 477, 485 (5th Cir.1980), cert. denied, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981)).
Our Court in Welter observed that the nuns' duties in computer science did not entail counseling students in spiritual or moral matters or instilling them with religious values. 128 N.J. at 299, 608 A.2d 206. Considering the average age and religious background of the student body, the Court could not infer that plaintiffs' responsibilities included imbuing their computer science *633 students or the general student population with Roman Catholic values. Ibid.
In contrast, in the companion case of Alicea v. New Brunswick Theological Seminary, 128 N.J. 303, 608 A.2d 218 (1992), plaintiff, an ordained minister and assistant professor at defendant seminary, performed a ministerial function. As Director of Urban Studies, plaintiff served as a "conduit between the church hierarchy and its minority seminarians and the urban population," and "functioned as a spokesperson for the church." Id. at 315, 608 A.2d 218. As an assistant professor, he had an "instrumental role in training ministers." Ibid. The Court determined that assuming jurisdiction over the parties' employment dispute would violate the seminary's "right to their free exercise of its religious beliefs." Id. at 311, 608 A.2d 218.
Several years later in Sabatino v. St. Aloysius Parish, 280 N.J. Super. 185, 654 A.2d 1033 (Law Div. 1994), aff'd, 288 N.J. Super. 233, 672 A.2d 217 (App.Div. 1996), plaintiff, a Catholic elementary school principal, was not rehired when several parishes consolidated and established a new parochial grammar school. Plaintiff claimed a violation of her employment contract. Id. at 188-89, 654 A.2d 1033. The Law Division judge accepted defendant's argument "that their selection of a school principal was guided by religious principle, and made pursuant to their exercise of religious freedom." Id. at 190, 654 A.2d 1033. The court determined that the selection of a clergy member over a lay person as school principal was justified, "given the fact that sectarian elementary schools carry out a very focused `religious mission.'" Id. at 194, 654 A.2d 1033 (citations omitted). We affirmed.
Defendants in the case before us contend that plaintiff's function was ministerial, arguing that "parochial school teachers, no matter what the subject matter being taught, are performing a ministerial function .... inculcating ... faith, values and moral precepts" into the students. "[S]ecular subjects in a parochial school are important vehicles for the propagation of the faith." "[R]eligion pervades *634 every aspect of the educational experience at the school and ... all teachers at Don Bosco, no matter what the subject taught, play a crucial role in the implementation of the religious mission of the school."
Defendants rely on Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), in which the Court determined that Rhode Island and Pennsylvania statutes which provided financial aid to parochial elementary and secondary schools violated the Establishment Clause because they involved "excessive entanglement between government and religion." 403 U.S. at 614, 91 S.Ct. at 2112, 29 L.Ed.2d at 756. The Court described the church schools involved in one of the programs:
Approximately two-thirds of the teachers in these schools are nuns of various religious orders. Their dedicated efforts provide an atmosphere in which religious instruction and religious vocations are natural and proper parts of life in such schools. Indeed, as the District Court found, the role of teaching nuns in enhancing the religious atmosphere has led the parochial school authorities to attempt to maintain a one-to-one ratio between nuns and lay teachers in all schools rather than to permit some to be staffed almost entirely by lay teachers.
On the basis of these findings the District Court concluded that the parochial schools constituted "an integral part of the religious mission of the Catholic Church." The various characteristics of the schools make them "a powerful vehicle for transmitting the Catholic faith to the next generation." This process of inculcating religious doctrine is, of course, enhanced by the impressionable age of the pupils, in primary schools particularly. In short, parochial schools involve substantial religious activity and purpose.
[403 U.S. at 615-16, 91 S.Ct. at 2112-13, 29 L.Ed.2d at 757 (footnote omitted).]
The Court also commented:
In terms of potential for involving some aspect of faith or morals in secular subjects, a textbook's content is ascertainable, but a teacher's handling of a subject is not. We cannot ignore the danger that a teacher under religious control and discipline poses to the separation of the religious from the purely secular aspects of precollege education. The conflict of functions inheres in the situation.
[403 U.S. at 617, 91 S.Ct. at 2113, 29 L.Ed.2d at 758.]
The Court concluded: "Religious authority necessarily pervades the school system." Ibid.
The Court determined that the financial aid plans, supplementing the salaries of non-public elementary school teachers of secular subjects, required "entangling church-state relations of the *635 kind the Religion Clauses sought to avoid." 403 U.S. at 616, 91 S.Ct. at 2113, 29 L.Ed.2d at 758. To insure that "subsidized teachers do not inculcate religion," the State had imposed "pervasive restrictions." 403 U.S. at 619, 91 S.Ct. at 2114, 29 L.Ed.2d at 759. "A comprehensive, discriminating, and continuing State surveillance will inevitably be required to insure that these restrictions are obeyed...." Ibid. "These prophylactic contacts will involve excessive and enduring entanglement between state and church." 403 U.S. at 619, 91 S.Ct. at 2114, 29 L.Ed.2d at 759-60.
The Court also considered the "broader base of entanglement of yet a different character ... presented by the divisive political potential of these state programs." 403 U.S. at 622, 91 S.Ct. at 2115, 29 L.Ed.2d at 761. "[P]olitical division along religious lines was one of the principal evils against which the First Amendment was intended to protect." Ibid. (citation omitted). Finally, the Court was concerned that these state programs "would prove to be the first step in an inevitable progression leading to the establishment of state churches and state religion." 403 U.S. at 624, 91 S.Ct. at 2116-17, 29 L.Ed.2d at 762.
Defendants in the case before us seek to analogize the facts in Lemon, an Establishment Clause excessive entanglement case, to convince us, in support of their free exercise claim, that all parochial secondary school teachers perform ministerial functions. The Court in Lemon did not consider or decide whether lay parochial high school teachers of secular subjects were ministerial employees. Rather, the Court was concerned with the "comprehensive, discriminating, and continuing state surveillance" of the schools which the program required. 403 U.S. at 619, 91 S.Ct. at 2114, 29 L.Ed.2d at 759.
The facts here do not resemble those in Lemon. For example, in Lemon approximately two-thirds of the teachers in the schools were nuns. 403 U.S. at 615, 91 S.Ct. at 2112, 29 L.Ed.2d at 757. Here, in contrast, only nine out of forty-one faculty members were Salesian priests or brothers during the 1990-91 school year. The Court in Lemon emphasized the large number of teaching nuns in *636 the Rhode Island parochial schools in reaching its entanglement conclusion: "[A] dedicated religious person, teaching in a school affiliated with his or her faith and operated to inculcate its tenets, will inevitably experience great difficulty in remaining religiously neutral." 403 U.S. at 618, 91 S.Ct. at 2114, 29 L.Ed.2d at 759. Nor did Lemon rule that all secular high school subjects, such as English and history, included religion and propagation of the faith, as defendants here seek to persuade us. Rather, the Court simply recognized the possibility that this might occur, stating that it was a "potential" and a "danger" where three-quarters of the faculty were clergy. 403 U.S. at 617, 91 S.Ct. at 2113, 29 L.Ed.2d at 758.
As plaintiff emphasizes, the question of whether her job duties were ministerial in any sense was an issue which was not factually "advanced at trial" by defendants. Judge Stark had denied defendants' motion for summary judgment, finding that plaintiff's teaching was "a [non]-ministerial duty performed by a lay person with no overtones of ... religious precepts." However, the judge later denied plaintiff's motion to dismiss defendants' First Amendment constitutional defense, without further explanation. Defendants did not raise the issue of plaintiff's ministerial function at trial or attempt to create any material fact issue on the point by an offer of proof. R. 1:7-3. In this context, we entertain the First Amendment defense as a question of law raised by defendants and rejected at the trial level.
On direct examination of Father Ploch, defendant's provincial superior, defense counsel asked him to "explain the role that religion plays in the ... instruction to the students" at Don Bosco. Plaintiff's attorney objected, claiming that religion should not be "brought into this case" because it was not relevant, When asked the purpose of the question, defense counsel responded that he wanted to show that "religion permeates the school atmosphere at Don Bosco Prep High School." Plaintiff's attorney said, "I'll stipulate to that."
Defendants now rely on this stipulation, plus "The philosophy of Don Bosco Preparatory High School" and the guide to hiring *637 teachers, "Characteristics of Teachers in Catholic Schools," to support their contention that all parochial school teachers, regardless of the subject taught, perform a ministerial function. However, none of these generalized contentions support the conclusion that propagation of the faith was an integral part of the curriculum in secular subjects taught by plaintiff.
Building on the Court's comment in Lemon, supra, that Catholic school teachers do not remain neutral, 403 U.S. at 618, 91 S.Ct. at 2114, 29 L.Ed.2d at 759, defendants "imagine the potential for religious influence" in discussions of current events, including prayer in public schools, public funding of abortions, and birth control. Defendants suggest that the subject of literature "might be particularly susceptible to religious influence," and "the very selection ... of course materials to teach could likely be impacted by religious values." However, this is speculation. There is no evidence in this record regarding religious content of the English and history courses which plaintiff taught. As we have observed, Father Ploch testified that a teacher at Don Bosco Prep need not be Catholic and that some of the faculty indeed were not Catholics. Nor did the defendants ever raise a shadow of a claim that plaintiff here in any way undermined the Catholic mission or teachings of Don Bosco Prep or served as a poor moral example. Their defense was that she was laid off for budget reasons only.
The only evidence relevant to plaintiff's alleged ministerial function was the agreement contained in her contract to "exemplify Christian principles and ideals in ... her teaching and in performance of all duties assigned" to her. Further, Scanlon said that each teacher begins each class with a prayer. As plaintiff and amicus Division on Civil Rights point out, the Court in Welter, supra, said the fact that faculty members serve as "exemplars of practicing Christians" does not automatically make their duties ministerial. 128 N.J. at 298, 608 A.2d 206.
Other courts which have considered this issue have determined that teachers of secular subjects in primary and secondary religious schools do not have ministerial functions. In Geary v. *638 Visitation of the Blessed Virgin Mary Parish School, 7 F.3d 324 (3d Cir.1993), the Third Circuit ruled that the Age Discrimination in Employment Act, 29 U.S.C.A. § 623, could apply to a lay teacher in a religious elementary school. Defendant claimed that it dismissed plaintiff because she violated Church doctrine by marrying a divorced man, but plaintiff asserted that her age was the reason for her dismissal. The court rejected defendant's contention that the role of an elementary school teacher was similar to that of a member of the clergy. "[N]otwithstanding [plaintiff's] apparent general employment obligation to be a visible witness to the Catholic Church's philosophy and principles, a court could adjudicate [plaintiff's] claims without the entanglement that would follow were employment of clergy or religious leaders involved." Id. at 331.
In Equal Employment Opportunity Comm'n v. Fremont Christian School, 781 F.2d 1362 (9th Cir.1986), plaintiff, a teacher in a church-owned and operated private school, pre-school through twelfth grade, alleged sex discrimination because of a school policy that provided health insurance only to heads of households, meaning single persons and married men. The Ninth Circuit rejected defendant's argument that "because the School is an integral part of the religious mission of the Church to its children, coupled with the highly specialized role of the teacher, a role it claims to be a ministry, the entanglement implications are significant." Id. at 1369. The court found that "the duties of the teachers at Fremont Christian School do not fulfill the function of a minister." Id. at 1370.
Courts that have considered a free-exercise-of-religion challenge to statutes prohibiting discrimination, as applied to teachers in religious schools, have used the general test for government regulation which interferes with the practice of religion. There must be a "compelling state interest" that "justifies the substantial infringement" of the First Amendment right. Sherbert v. Verner, 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965, 972 (1963) (an employee discharged for refusing to *639 work on Saturdays for religious reasons was eligible for unemployment benefits).
In Fremont Christian School, the court determined that rectifying a health insurance benefits program that discriminated on the basis of sex "should have no significant impact on Fremont Christian religious beliefs or doctrines." 781 F.2d at 1368. On the other hand, "the interest in equal employment opportunities is high," so that "the balance weighs heavily in favor of upholding Fremont Christian's liability under Title VII for its sexually discriminatory health insurance compensation program." Id. at 1369.
In Rayburn v. General Conference of Seventh-day Adventists, 772 F.2d 1164 (4th Cir.1985), cert. denied, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986), plaintiff alleged that she was denied a pastoral position because of discrimination on the basis of sex and race. Id. at 1164-65. Discussing the exemption in Title VII for religious institutions, the court said: "While ... religious institutions may base relevant hiring decisions upon religious preferences, Title VII does not confer upon religious organizations a license to make those same decisions on the basis of race, sex, or national origin." Id. at 1166. However, since plaintiff was seeking a pastoral position, the court found that the government's attempt "to restrict a church's free choice of its leaders ... constitutes a burden on the church's free exercise rights." Id. at 1168. Thus, the balance between those rights and the State's interest in prohibiting discrimination "weighs in favor of free exercise of religion." Ibid.
A teacher of secular subjects need not be considered a religious leader. Here, as in Fremont Christian, supra, enforcing the prohibition against discrimination would have no impact on religious belief, doctrine, or practice. As plaintiff and the amici point out, defendants did not attempt to justify their discrimination against the plaintiff in the case before us on any religious grounds. Rather, they alleged that she was terminated for budgetary reasons only. Thus, since "the underlying dispute" does *640 not "[turn] on doctrine or polity," the court should not "abdicate [its] duty to enforce secular rights." Welter, supra, 128 N.J. at 293, 608 A.2d 206.
In Sacred Heart School Bd. v. Labor and Indus. Review Comm'n, 157 Wis.2d 638, 460 N.W.2d 430 (Ct.App. 1990), respondent Sullivan, a lay teacher at a religious elementary school, alleged that she was terminated because of her age. When respondent Commission found probable cause to believe that there was age discrimination, petitioner claimed that holding a hearing would violate its right to free exercise of religion. The Wisconsin Fair Employment Law, like our LAD, had a narrow exemption, allowing religious employers to discriminate on the basis of religion. Id. 460 N.W.2d at 432. "However, the exemption does not permit religious employers to practice prohibited forms of discrimination. Thus, the [Equal Rights Division] has an obligation to determine whether even religious employers have practiced discrimination." Ibid. The court rejected petitioner's argument that "the free exercise clause of the First Amendment gives religious groups a constitutional right to autonomy and requires courts to defer to [their] decisions." Id. 460 N.W.2d at 433. The court reasoned that the State had "an overriding governmental interest." Ibid. "If we accepted the school's autonomy argument, the court would be awarding the religious employer a talisman to protect it from all discrimination law suits. This we cannot allow." Ibid.
Defendants cite Little v. Wuerl, 929 F.2d 944 (3d Cir.1991), in which a Protestant teacher in a Catholic school claimed religious discrimination when she was terminated because she had remarried without properly validating her second marriage. The Third Circuit held that the exemption in Title VII for religious institutions applied:
We conclude that the permission to employ persons "of a particular religion" includes permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts. Thus, it does not violate Title VII's prohibition of religious discrimination for a parochial school to discharge a Catholic *641 or a non-Catholic teacher who has publicly engaged in conduct regarded by the school as inconsistent with its religious principles.
[Id. at 951.]
Again, in contrast, plaintiff Gallo here has not engaged in any conduct which defendants consider inconsistent with their religious principles, and defendants do not invoke the exemption in the LAD permitting discrimination on account of religion.
Amici American Civil Liberties Union and Women's Rights Litigation Clinic stress the compelling state interest in eliminating discrimination on the basis of age and sex. They emphasize the devastating effect of "sex and age-based stereotyping" and "devaluation of older women's work," which is "a problem that has gone unseen for too long." Amici urge that the exemption of defendants "would lead their students to believe that discrimination based on age and gender is acceptable in New Jersey," contrary to the legislative intent:
The Legislature finds and declares that practices of discrimination against any of its inhabitants, because of ... age [and] sex ... are matters of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State....
[N.J.S.A. 10:5-3.]
Amici also suggest the practical significance of a ruling that Catholic schools are exempt from the LAD: there are nearly 10,000 teachers in 486 Catholic schools in New Jersey. The Official Catholic Directory, General Summary at 22 (1992). This includes some 1700 clergy: priests, brothers and sisters.
Our Supreme Court has asserted that "[t]he elimination of discrimination in educational institutions is particularly critical." Frank v. Ivy Club, 120 N.J. 73, 110, 576 A.2d 241 (1990), cert. denied sub nom. Tiger Inn v. Frank, 498 U.S. 1073, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991). "The[re]... [is no] more sensitive area than educational institutions where ... youth are exposed to a multitude of ideas that will strongly influence their future development. To permit discrimination here would, more than in any other area, tend to promote misconceptions leading to future *642 patterns of discrimination." Dixon v. Rutgers, The State Univ., 110 N.J. 432, 453, 541 A.2d 1046 (1988) (quoting H.R.Rep. No. 92-238, 92d Cong., 2d Sess. 19-20 (1972), reprinted in 1972 U.S.C.C.A.N. 2137, 2155).
Amicus Division on Civil Rights stresses that the Supreme Court has recently declined to use the compelling-state-interest balancing test in considering an Oregon criminal law prohibiting the use of peyote. Employment Div. v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The Court explained: "We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." 494 U.S. at 878-79, 110 S.Ct. at 1600, 108 L.Ed.2d at 885. The Court declined to apply "the Sherbert test [compelling governmental interest, 374 U.S. at 402-03, 83 S.Ct. at 1793, 10 L.Ed.2d at 965] to analyze free exercise challenges" to "across-the-board criminal prohibition[s] on a particular form of conduct." 494 U.S. at 884, 110 S.Ct. at 1603, 108 L.Ed.2d at 889. The Court was concerned that application of the "compelling government interest" test would produce "a private right to ignore generally applicable laws." 494 U.S. at 886, 110 S.Ct. at 1604, 108 L.Ed.2d at 890.
Defendants in their reply brief quite properly point out that Employment Div. v. Smith was explicitly "overruled" by the Religious Freedom Restoration Act (RFRA) of 1993, 42 U.S.C.A. § 2000bb to § 2000bb-4. The expressed purpose of the Act was "to restore the compelling interest test as set forth in Sherbert v. Verner, [supra]," 42 U.S.C.A. § 2000bb(b)(1), in Free Exercise Clause situations which the Supreme Court had "virtually eliminated" in Employment Div. v. Smith, supra. 42 U.S.C.A. § 2000bb(a)(4).[2] For purposes of constitutional analysis, we readily *643 defer to and accept the RFRA restoration of the "compelling interest" test to Free Exercise Clause analysis.[3]
We conclude that the State's interest in abolishing age and gender discrimination is compelling, beyond cavil, N.J.S.A. 10:5-3; *644 Fremont Christian School, supra, 781 F.2d at 1368; Frank v. Ivy Club, supra, 120 N.J. at 110, 576 A.2d 241; Dixon v. Rutgers, The State Univ., supra, 110 N.J. at 453, 541 A.2d 1046; Sacred Heart School Bd., supra, 460 N.W.2d at 433, and that enforcement of that interest does not constitute a substantial burden on religion in the circumstance of a high school lay teacher of English and history under the present facts.

THE ESTABLISHMENT CLAUSE
Defendants next contend that even if plaintiff's job was non-ministerial, the enforcement of the LAD against them creates excessive entanglement between government and religion, in violation of the Establishment Clause. Although we see no analytic difference between the two religion clauses for purposes of this case, we address the defendants' Establishment Clause claim separately in deference to their dichotomous presentation.
In Lemon v. Kurtzman, supra, the Court set forth three tests "gleaned from our cases" to determine whether a statute violates the establishment clause: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster `an excessive government entanglement with religion.'" 403 U.S. at 612-13, 91 S.Ct. at 2111, 29 L.Ed.2d at 755 (quoting Walz v. Tax Comm'n, 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697, 704 (1970) (citation omitted)). In discrimination cases, there is no question that the statute has a secular legislative purpose and that its effect neither advances nor inhibits religion. Fremont Christian School, supra, 781 F.2d at 1369; Rayburn, supra, 772 F.2d at 1170 n. 6. Defendants claim only the third prong, excessive government entanglement with religion, is involved in this case.
In Lemon, the Court found such improper entanglement because of "the cumulative impact of the entire relationship." 403 U.S. at 614, 91 S.Ct. at 2112, 29 L.Ed.2d at 756.

*645 To ensure that no trespass occurs, the State has therefore carefully conditioned its aid with pervasive restrictions. An eligible recipient must teach only those courses that are offered in the public schools and use only those texts and materials that are found in the public schools. In addition the teacher must not engage in teaching any course in religion.
A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected.
[403 U.S. at 619, 91 S.Ct. at 2114, 29 L.Ed.2d at 759.]
Similarly in Catholic Bishop of Chicago v. N.L.R.B., 559 F.2d 1112 (7th Cir.1977), aff'd on other grounds, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), upon which defendants also rely, the court found that continuous, ongoing jurisdiction of the National Labor Relations Board over Catholic high schools would involve excessive entanglement. The Supreme Court construed the National Labor Relations Act as not authorizing jurisdiction over the schools, to avoid the need for resolution of the First Amendment religion clause issues. 440 U.S. at 504-07, 99 S.Ct. at 1320-22, 59 L.Ed.2d at 543-45. However, the Court found that "the exercise of the Board's jurisdiction presents a significant risk that the First Amendment will be infringed." 440 U.S. at 502, 99 S.Ct. at 1319, 59 L.Ed.2d at 542. The Court was concerned that the schools would answer charges of unfair labor practices by asserting that their actions were mandated by religious belief. The Board would thus have to inquire "into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission." Ibid. Not only the conclusions, but also "the very process of inquiry" might infringe on the rights guaranteed by the religion clauses. Ibid.
Here, in contrast, defendants do not contend that religious belief mandated their challenged actions. There was a simple factual issue: whether defendants discriminated against plaintiff on the basis of sex and age. Neither the resolution of this issue nor the inquiry into it impinged on defendants' religious freedom. No inquiry into faith, morals or religious polity was required.
*646 Defendants also rely on Dayton Christian Schools v. Ohio Civil Rights Comm'n, 766 F.2d 932 (6th Cir.1985), rev'd on other grounds, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986). There, plaintiff, a religious school teacher, was initially terminated when she became pregnant, because of defendant's religious doctrine that a mother should stay home with her baby. 766 F.2d at 934. When plaintiff retained an attorney and threatened to sue, defendant terminated her for failing to follow the required "Biblical chain of command." Ibid. Since defendant's actions were taken pursuant to sincerely held religious beliefs, the Sixth Circuit determined that the exercise of jurisdiction by the Ohio Civil Rights Commission would violate both the Free Exercise and Establishment Clauses of the First Amendment. Id. at 947, 961. The Supreme Court reversed, holding that the district court, under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), should have abstained from deciding the constitutional issue, since plaintiff would have had a full and fair opportunity to litigate her constitutional claim in the state courts. 477 U.S. at 628, 106 S.Ct. at 2723, 91 L.Ed.2d at 522-23. However, the Court commented:
Even religious schools cannot claim to be wholly free from some state regulation. We therefore think that however Dayton's constitutional claim should be decided on the merits, the Commission violates no constitutional rights by merely investigating the circumstances of [plaintiff's] discharge in this case, if only to ascertain whether the ascribed religious-based reason was in fact the reason for the discharge.
[Ibid. (citation omitted).]
Courts have generally rejected Establishment Clause defenses to a teacher's claim of discrimination. In Geary v. Visitation of the Blessed Virgin Mary Parish School, supra, 7 F.3d 324,[4] *647 previously discussed, plaintiff, an elementary school teacher, alleged that defendant dismissed her because of her age but defendant asserted that she violated church doctrine by marrying a divorced man. Id. at 326. Plaintiff admitted that she violated church doctrine but argued that this reason for her discharge was pretext. Ibid. In addition, after plaintiff instituted an action in the Equal Employment Opportunity Commission, defendant cancelled her health insurance. The Third Circuit rejected defendant's claim, identical to the claim here, that application of the Age Discrimination in Employment Act (ADEA) would unduly entangle government and religion. Id. at 328. The court distinguished Catholic Bishop, supra, on the ground that it involved "pervasive supervision," whereas a claim of discrimination on the basis of age involves only a "simple prohibition." Ibid. The court said:
Apart from the distinction between ongoing supervision and limited inquiry, another consideration prompts our conclusion that application of the ADEA will not create a significant risk of entanglement. There is an absence here of any direct conflict between the ADEA's secular prohibition and the proffered religious doctrine. Visitation School does not suggest that the Catholic religion mandates age discrimination, nor does Geary suggest that the ADEA prohibits Visitation School's right to implement Catholic teachings on marriage.
[Ibid.]
Geary addressed the concern raised by defendants here, and set forth in Catholic Bishop, supra, that the "process of inquiry" alone would entangle government with religion. Id. at 330.
The secular tribunal merely asks whether a sincerely held religious belief actually motivated the institution's actions.... Indeed, because the court in an ADEA case should not examine either the validity or the religious nature of the doctrine, the burden of the religious institution to explain is considerably lighter than in a non-religious employer case....
Thus, when the pretext inquiry neither traverses questions of the validity of religious beliefs nor forces a court to choose between parties' competing religious *648 visions, that inquiry does not present a significant risk of entanglement. However, the First Amendment dictates that a plaintiff may not challenge the validity, existence or "plausibility" of a proffered religious doctrine, and we caution that the ADEA would not apply in such a case.
[Ibid.]
The Third Circuit in Geary concluded that "since religious institutions are not exempt from Title VII's prohibitions of discrimination on the basis of race, color, sex, and national origin, neither are they exempt from the ADEA's prohibition of age discrimination." Id. at 331. However, since plaintiff "did not contest that she in fact violated the very doctrine that Visitation School claimed as the reason for her dismissal, and she did not present any evidence that would suggest a non-religious [age] basis for her dismissal," the court affirmed summary judgment in defendant's favor on this claim. The court reversed the summary judgment in favor of defendant on the retaliation claim, noting that defendant conceded that it did not assert any First Amendment defense to that claim.
In the case before us, as in Geary, there is no excessive entanglement between government and religion where the LAD presents a simple prohibition, not ongoing or pervasive supervision. Nor is there any conflict between the LAD's prohibition against discrimination and any proffered religious doctrine of defendants. As in Geary, defendants here do not claim that their religion mandated age or sex discrimination against plaintiff; the sole defense was that plaintiff was terminated for budgetary reasons. The trial court did not have to consider religious doctrine in any way, not even to determine whether any claimed religious reason actually motivated the termination or was pretextual. No religious doctrine was implicated, much less the validity, existence or plausibility of any proffered religious-doctrine defense. Since the federal courts do not hesitate to apply both Title VII and the ADEA to religious institutions when no religious doctrine is involved, we conclude the LAD should be similarly applied.
*649 Courts reached the same result in DeMarco, supra, 4 F.3d 166; Fremont Christian School, supra, and Sacred Heart School Bd., supra. In DeMarco, plaintiff, a math teacher at a parochial high school, claimed that he was dismissed because of his age. 4 F.3d at 168. The school claimed that it dismissed plaintiff because he failed to begin classes with a prayer and failed to attend Mass with his students. Ibid. Defendant also contended, like defendants here, that "as a religious institution, it was statutorily exempt from the ADEA's anti-discrimination provisions." Ibid. The court again rejected the excessive-entanglement argument, distinguishing Catholic Bishop, supra, on the ground that "ADEA actions do not require extensive or continuous administrative or judicial intrusion into the functions of religious institutions. The sole question at issue in an ADEA case is whether the plaintiff was unjustifiably treated differently because of his age." 4 F.3d at 170.
As in Geary, the court in DeMarco recognized that when a defendant proffers a religious reason for the employment action, the genuineness or plausibility of that reason is an issue. 4 F.3d at 171. The court reasoned: "However, this Establishment Clause concern does not lead us to hold that the ADEA does not apply to the case at bar. Rather, it requires us only to conclude that ADEA plaintiffs may not challenge the plausibility of putative religious purposes." Ibid. The court concluded: "[T]he able district judge will be able to focus the trial upon whether DeMarco was fired because of his age or because of failure to perform religious duties, and ... this can be done without putting into issue the validity or truthfulness of Catholic religious teaching." Id. at 172. In Sacred Heart School Bd., the court distinguished Catholic Bishop on the same basis:
Collective bargaining and NLRB supervision involve ongoing state scrutiny of employer/employee relations. State regulation of employment discrimination, by contrast, involves only sporadic investigation of employee complaints. The intrusion is minimal and is not an attempt to interfere with religious schools. Moreover, the school is still free to discharge employees for religious reasons.
[460 N.W.2d at 432.]
Accord, Fremont Christian School, supra, 781 F.2d at 1369-70.
*650 Defendants here attempt to distinguish Geary and DeMarco on the ground that the substantial discovery to which defendants were subjected was more than the "simple prohibition" to which the court referred in Geary, 7 F.3d at 328. Defendants point out that both the Attorney General, under N.J.S.A. 10:5-8(i), and the Director of the Division on Civil Rights, under N.J.A.C. 13:4-2.1, have extensive, discretionary authority to investigate and insure compliance with the LAD. Defendants contend that although plaintiff brought her claim in the Superior Court rather than the Division on Civil Rights, the enforcement powers of the Attorney General and Director nevertheless "create an impermissible risk of entanglement," and "it is inconceivable that the constitutionality of the statute will rise or fall with a plaintiff's choice of forum."
Defendants also complain about "the actual entanglement that ensued in this case," and the "astounding scope of discovery" that the court permitted. Plaintiff requested personnel records of other faculty members. The judge granted the motion, limiting discovery to the eight years that plaintiff worked at the school and excluding the records of nuns and priests. However, the judge refused to exclude discovery of the records of lay teachers of religion.
Defendants point out that in Welter the Court rejected "the notion that an employee's status as a cleric within a religious organization, standing alone, justifies judicial abstention from enforcement of rights in job security." 128 N.J. at 294, 608 A.2d 206. The Court instead looked to the function which the employee performed. Id. at 294-99, 608 A.2d 206. Defendants thus complain that the records of two lay teachers of religion, Robert Ferrara and Anthony Monks, were used against them. Ferrara, who previously taught theology and Latin, was assigned to teach history and Latin in the 1991-92 school year, when plaintiff's contract was not renewed. He had been disciplined several times, *651 for physically correcting students and for allowing a student to preview an examination. Monks, who had also previously taught theology, was assigned to teach English in the 1991-92 school year. Scanlon had considered not renewing Monks in the spring of 1991. Defendants complain that "they were forced to defend their choice of retaining someone who clearly had served in a ministerial capacity  an impermissible intrusion by secular authorities into church polity." However, as defendants admit, both Ferrara and Monks were assigned secular subjects for the year in issue, 1991-92, indeed the same secular subjects taught earlier by plaintiff. That Ferrara and Monks had previously taught religion was incidental, and not significant. Defendants were not forced to defend their choice of religion teachers since the teaching of religion was not in question. The issue was who was chosen to teach English and history in the 1991-92 school year. We find no intrusion here into defendants' decision as to who would propagate the faith.
Defendants' final contention is that plaintiff's discovery demands disrupted and interfered with the functioning of the school. Teachers were subpoenaed, disrupting their schedules and causing them "great alarm and concern." Further, defendants' financial records, including teachers' salary information, the school's loan transactions, and annual budgets and financial reports, "were opened to the scrutiny of the plaintiff and the courts."
As to the alleged disruption of the school's functioning, there was no evidence that classes were cancelled or that school was ever interrupted because of the pretrial discovery procedure. Defendants have failed to show how this discovery was any more intrusive or disruptive than the discovery in other cases where employment discrimination has been alleged against a religious school, such as Geary, DeMarco, or Fremont Christian School.
As plaintiff and amicus Division on Civil Rights point out, "it seems as though defendants are requesting a total exemption from any litigation whatsoever!" and "[t]he discovery process is a part of any case." They claim that a holding that discovery in an *652 action against a parochial school was unduly intrusive would bar any type of discrimination claim. In Dayton Christian Schools, supra, the Supreme Court specifically authorized investigation of the circumstances of the teacher's discharge, "if only to ascertain whether the ascribed religious-based reason was in fact the reason for the discharge." 477 U.S. at 628, 106 S.Ct. at 2723, 91 L.Ed.2d at 523. The Ninth Circuit in Fremont Christian School, addressed the problem of the intrusiveness of discovery in an employment discrimination (equal pay) case against a religious institution. Fremont Christian School involved an even more intrusive "level of government involvement," an injunction requiring Title VII compliance, but the court determined this did "not make this case substantially different," and concluded that: "[T]he employment practices involved in the present case are subject to Title VII scrutiny." 781 F.2d at 1370.
In Rayburn, when declining to review a church's selection for a pastoral position, which allegedly involved discrimination on the basis of race and sex, the Fourth Circuit said:
A Title VII action is potentially a lengthy proceeding, involving state agencies and commissions, the EEOC, the federal trial courts and courts of appeal. Church personnel and records would inevitably become subject to subpoena, discovery, cross-examination, the full panoply of legal process designed to probe the mind of the church in the selection of its ministers.
....
Of course churches are not  and should not be  above the law. Like any other person or organization, they may be held liable for their torts and upon their valid contracts. Their employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions.
[772 F.2d at 1171 (citations omitted).]
We conclude that the intrusiveness of carefully measured discovery is no reason to exempt defendants from LAD scrutiny where the school's spiritual functions are not in issue. Defendants are not entitled to a blanket exemption from all secular regulations because of their status as a religious institution. We reject the defendants' Establishment Clause challenge.

*653 IV.
Defendants next contend that they are permitted to give preference to male teachers under N.J.S.A. 18A:6-6:
No discrimination based on sex shall be made in the formulation of the scale of wages, compensation, appointment, assignment, promotion, transfer, resignation, dismissal, or other matter pertaining to the employment of teachers in any school, state college, college, university, or other educational institution, in this state, supported in whole or in part by public funds unless it is open to members of one sex only, in which case teachers of that sex may be employed exclusively.
Judge Stark, denying defendants' motion for summary judgment on this issue, determined that this statute was either directly overruled, or at least fatally undermined. Amicus Division on Civil Rights makes a strong argument that the addition of sex to the prohibited bases of discrimination in employment in N.J.S.A. 10:5-4; L. 1970, c.80, § 9, impliedly repealed this statute.
Amicus Division on Civil Rights also contends that N.J.S.A. 18A:6-6 applies only to public schools, and does not apply to defendant, which is not "supported in whole or in part by public funds." Defendant's current principal submitted an affidavit describing the school's receipt of public funds in its purchase of educational materials, in-service teacher training, transportation of students, and nursing services and equipment. However, we find it unnecessary to reach this issue, since N.J.S.A. 18A:6-6 obviously does not apply here.
N.J.S.A. 18A:6-6 allows the employment of a same-sex faculty in a school that is, like defendant, "open to members of one sex only." However, this employment practice is extremely limited: "teachers of that sex may be employed exclusively." Here, as Scanlon set forth in his affidavit, defendant does not employ teachers of one sex exclusively. Its teachers are both men and women. Don Bosco Prep is not covered by N.J.S.A. 18A:6-6 and it may not discriminate against the women teachers whom it employs.
Defendants are incorrect in claiming this statute permits them to "employ a preponderance" or "provide an abundance of *654 same-sex role models for [their] students." The statute permits a single-sex faculty. Having opted for a faculty composed of both sexes, a defendant may not claim a right to treat presumptively co-equal, non-ministerial employees differently based upon sex, a notion which represents simple, garden-variety prejudice. Defendants' disparate treatment of plaintiff on the basis of sex was not protected by N.J.S.A. 18A:6-6.

V.
Defendants' final point is that plaintiff was required to follow the grievance procedure in her contract. Plaintiff claims that defendants waived this defense because they failed to raise it either at trial or in their post-trial motion. Defendants retort that this contention was raised and denied on the summary judgment. As defendants point out, they raised this issue below only with regard to their contract claims. However, Judge Stark ruled that plaintiff was not required to follow the grievance procedure on her "constitutional claims" of discrimination; as the issue was considered in the Law Division, we must review it.
Plaintiff does not deny that she failed to follow the grievance procedure but asserts that it would have been futile. However, as amicus Division on Civil Rights points out, a contractual grievance procedure does not bar a plaintiff from asserting a discrimination claim under the LAD. In Thornton v. Potamkin Chevrolet, 94 N.J. 1, 462 A.2d 133 (1983), plaintiff filed a grievance in accordance with his collective bargaining agreement which was submitted to arbitration but did not raise the issue of racial discrimination. Later, when he filed a complaint with the Division on Civil Rights, alleging racial discrimination in violation of the LAD, the Division determined that the entire-controversy doctrine barred his claim. The Supreme Court held that the entire-controversy doctrine was not applicable "because there is no comparability between private contractual arbitration and court or administrative adjudications." Id. at 5, 462 A.2d 133. Noting the public interest in enforcement of the LAD, and the Legislature's *655 choice of forum in which to vindicate that public interest, the Court concluded that "neither failure to present nor unsuccessful prior submission of a discrimination claim to an available arbitration process provided in a labor agreement will foreclose an employee's statutory right to present the claim to the Division on Civil Rights." Id. at 9, 462 A.2d 133.
In Teaneck Bd. of Educ. v. Teaneck Teachers Ass'n, 94 N.J. 9, 462 A.2d 137 (1983), a teacher claimed racial discrimination when the Board of Education failed to appoint him to the position of assistant basketball coach. The teacher filed a grievance under the parties' collective bargaining agreement which was submitted to arbitration. The Board objected that a substantive hiring decision was a managerial prerogative, not subject to arbitration, and the Court agreed. However, the Court added that there was "no managerial prerogative to discriminate," and that the Division on Civil Rights had "paramount jurisdiction" to decide the dispute. Id. at 17, 462 A.2d 137.
The Supreme Court approved these rulings, holding that a collective bargaining agreement which restricted access to personnel files did not preclude a discrimination plaintiff's discovery of these materials. Dixon v. Rutgers, the State Univ., supra, 110 N.J. at 459-61, 541 A.2d 1046. See Alexander v. Gardner  Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (an employee who submits a claim of racial discrimination to binding arbitration under a collective bargaining agreement is entitled to assert the same claim under Title VII); LePore v. National Tool and Mfg. Co., 115 N.J. 226, 557 A.2d 1371, cert. denied, 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 353 (1989) (an employee who was discharged in retaliation for reporting workplace safety violations could bring an independent state cause of action despite a grievance procedure in a collective bargaining agreement). But see Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (an age discrimination claim of a securities representative was subject to compulsory arbitration under an agreement in his registration application).
*656 Defendants rely on Fregara v. Jet Aviation Business Jets, 764 F. Supp. 940 (D.N.J. 1991), in which plaintiff employee alleged that he was discharged in violation of the personnel policies contained in an employee handbook. The court determined that his claim was barred because he failed to follow the detailed grievance procedure set forth in the handbook: "If the plaintiff seeks to rely on provisions in the employee handbook as the source of an implied contract of employment, then he must accept that agreement as a whole with its attendant responsibilities." Id. at 951.
Here, in contrast, plaintiff's discrimination claims are not based on her contract of employment. Fregara did not involve a claim of discrimination. The Supreme Court in Thornton relied on "[t]he public interest in enforcement of the Law Against Discrimination" to conclude that the plaintiff there was permitted to bring his claim in the Division on Civil Rights, although he had failed to raise it in his grievance arbitration. 94 N.J. at 6, 462 A.2d 133. Similarly, plaintiff's failure to follow the grievance procedure does not bar her statutory discrimination claims.

VI.
On the direct appeal, plaintiff's attorney asserts that the judge erred in refusing to multiply his fee award by two to compensate for the contingency of success. Plaintiff relies on Rendine v. Pantzer, 276 N.J. Super. 398, 648 A.2d 223 (App.Div. 1994), decided two-and-one-half months after the judge's opinion and recently modified by our Supreme Court, 141 N.J. 292, 661 A.2d 1202 (1995).
Plaintiff points out that there were no "mitigating payment circumstances" and that this case was "especially non-palatable" because she confronted a large religious organization. Using "probability theory," plaintiff asserts that with a 50% chance of success, an attorney would value a case at 50% of the lodestar. Plaintiff reasons that under these circumstances an attorney must "reject the case, or go bankrupt." She concludes that only use of *657 a multiplier produces "[a] reasonable fee ... which would induce an attorney to accept a case."
Under N.J.S.A. 10:5-27.1, in an action brought under the LAD, "the prevailing party may be awarded a reasonable attorney's fee." This court, in Rendine, approved the trial judge's use of a contingency multiplier which doubled plaintiffs' attorneys' lodestar fee. 276 N.J. Super. at 446-62, 648 A.2d 223. The lodestar fee is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Id. at 447, 648 A.2d 223. We emphasized the completely contingent nature, in effect, of the attorney-client fee agreement, id. at 447-49, 648 A.2d 223, and plaintiffs' difficulty in finding an attorney to represent them. Id. at 451-53, 648 A.2d 223. We rejected the reasoning of the United States Supreme Court in City of Burlington v. Dague, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992): "the Court absolutely abolished any enhancement of lodestar attorneys' fees for contingency under fee-shifting statutes. 505 U.S. at [565-66], 112 S.Ct. at 2643-44, 120 L.Ed.2d at 459." Rendine, supra, 276 N.J. Super. at 455, 648 A.2d 223. Rejecting "many of the arguments advanced against use of fee multipliers and enhancement" as "veiled attacks on the policy of any fee-shifting at all in discrimination cases," id. at 462, 648 A.2d 223, we decided that "a fee enhancement based on contingency considerations appears essential to the enforcement of the LAD." Id. at 458, 648 A.2d 223. We concluded: "The trial judge did not abuse his discretion in enhancing the fee in view of the evidence plaintiffs presented." Id. at 461, 648 A.2d 223.
The Supreme Court wrote "on a relatively clean slate in addressing the issue of contingency enhancement of lodestar fees under the LAD." Rendine, supra, 141 N.J. at 333, 661 A.2d 1202. The Court's goal was to set forth "a clear rule, one that can readily and definitively be applied by trial courts, a rule that will end, not perpetuate litigation of the issue." Id. at 334, 661 A.2d 1202. Stating the principles for calculating the lodestar, the Court concluded:

*658 We hold that the trial court, after having carefully established the amount of the lodestar fee, should consider whether to increase that fee to reflect the risk of nonpayment in all cases in which the attorney's compensation entirely or substantially is contingent on a successful outcome.... Both as a matter of economic reality and simple fairness, we have concluded that a counsel fee awarded under a fee-shifting statute cannot be "reasonable" unless the lodestar, calculated as if the attorney's compensation were guaranteed irrespective of result, is adjusted to reflect the actual risk that the attorney will not receive payment if the suit does not succeed.
[Id. at 337-38, 661 A.2d 1202.]
The Court directed trial judges to consider "whether a case was taken on a contingent basis, whether the attorney was able to mitigate the risk of non-payment in any way, and whether other economic risks were aggravated by the contingency of payment." Id. at 339, 661 A.2d 1202 (quoting Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 483 U.S. 711, 747, 107 S.Ct. 3078, 3098, 97 L.Ed.2d 585, 612 (1987) (Blackmun, J., dissenting)). Seeking substantial damages is one way of mitigating the risk of non-payment. 141 N.J. at 340, 661 A.2d 1202.
In addition, the Court directed trial judges to consider the likelihood of success, including "the inherent strength of the prevailing party's claim." Id. at 341, 661 A.2d 1202. The judge also should consider the result achieved and the extent of its significance for the public interest. The Court declined to condition contingency enhancements on a plaintiff's proof of difficulty in finding an attorney since this condition was "insufficiently related" to the reason for contingency enhancements, assuring a reasonable fee for the prevailing party. Ibid.
As to the amount of the contingency enhancement, the Court set the range at between twenty and thirty-five percent of the lodestar in "typical contingency cases," with a general range of five to fifty percent. Id. at 343, 661 A.2d 1202. "Such enhancements should never exceed one-hundred percent of the lodestar," with an enhancement that large reserved for the "rare and exceptional case" in which there was no mitigation of the risk of non-payment, no prospect for payment of a percentage of a large award, and a *659 significant result of broad public interest. Ibid. Noting the mitigation of the risk of non-payment by the strength of plaintiffs' case and the possibility of substantial compensation, the Court in Rendine reduced the contingency enhancement to one and one-third of the lodestar fee, instead of twice the lodestar.
Here, defendants do not contest plaintiff's assertion that her attorney accepted a completely contingent fee agreement. As to seeking substantial damages, defendants point out that plaintiff demanded $375,000 in compensatory damages plus punitive damages. No counter-offer was made. It is impossible for us to determine plaintiff's likelihood of success and the strength of her case, since we have no complete record of the trial. We conclude that the trial judge was in a better position to make those determinations.
We gain the impression from our review of the partial record which we have before us that plaintiff's proofs on non-economic damages, particularly the psychiatric aspect, were not very persuasive. The jury rejected that claim completely and awarded only the stipulated economic damages, $24,000. In the monetary sense, the success of the litigation was quite modest, although important principles of public policy were vindicated. We are mindful that there need not be a proportionality between counsel fees awarded and damages secured. See Szczepanski v. Newcomb Medical Center, 141 N.J. 346, 366, 661 A.2d 1232 (1995).
We are also mindful of the Supreme Court's desire expressed in Rendine, 141 N.J. at 334, 661 A.2d 1202, for an approach to the fee-shifting and add enhancement problems "that will end, not perpetuate litigation;" its "desire to avoid ancillary litigation over counsel-fee awards," id. at 344, 661 A.2d 1202; and the Court's "assumption that in the future the need for appellate supervision of counsel-fee awards under fee-shifting statutes will be infrequent." Id. at 345, 661 A.2d 1202. The setting of fees by a court in these cases involves the sound exercise of discretion. Id. at 317, 661 A.2d 1202. The Court said: "Our expectation is that future fee determinations by trial courts will be disturbed *660 only on the rarest occasions, and then only because of a clear abuse of discretion." Id. at 292, 661 A.2d 1202. Nowhere does the Court say that a fee enhancement multiplier must be awarded in every case.
Under the standards set out in Rendine and Szczepanski, we are satisfied that the $48,750 fee awarded against defendants pursuant to the adjusted lodestar satisfied the reasonable fee award policy of the LAD, N.J.S.A. 10:5-27.1. We find the judge's reduction of the lodestar within his sound discretion. "The damages prospectively recoverable and actually recovered" are factors to be considered. Szczepanski, 141 N.J. at 366, 661 A.2d 1232. See Silva v. Autos of Amboy, Inc., 267 N.J. Super. 546, 632 A.2d 291 (App.Div. 1993). We decline to remand, to enhance the fee by a multiplier, or to adjust the lodestar. We find no abuse of discretion in the fee award.

VII.
Plaintiff's final contention is that the judge erred in denying her costs and prejudgment interest. The judge exercised his discretion in denying both of these requests, adding that plaintiff's "incomplete success ... in recovering all desired elements of damages convinces me that it is appropriate for each side to bear its own costs."
R. 4:42-8(a) provides: "Unless otherwise provided by law, these rules or court order, costs shall be allowed as of course to the prevailing party." The judge here expressly found that plaintiff was a prevailing party. He should have awarded her costs "as of course" under the rule. See Regino v. Aetna Casualty and Surety Co., 200 N.J. Super. 94, 100, 490 A.2d 362 (App.Div. 1985); Pressler, Current N.J. Rules, Comment R. 4:42-8(a). We remand for an application for proof of costs.
As to prejudgment interest, R. 4:42-11(b) provides:
the court shall, in tort actions ... include in the judgment simple interest, calculated as hereafter provided, from the date of the institution of the action or *661 from the date six months after the date the cause of action arises, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest.
In N.J.S.A. 10:5-3 the Legislature found that "people suffer personal hardships" because of discrimination, listing the specific hardships.
Such harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.
[Ibid.]
In addition, N.J.S.A. 10:5-13 provides: "All remedies available in common-law tort actions shall be available to prevailing plaintiffs. These remedies are in addition to any provided by this act or any other statute."
Courts have used these provisions, together with R. 4:42-11, to award prejudgment interest in discrimination cases under the LAD. In Milazzo v. Exxon Corp., 243 N.J. Super. 573, 575-76, 580 A.2d 1107 (Law Div. 1990), the court, giving "full force and effect" to the legislative intent, concluded that prejudgment interest was one of the "remedies available in common-law tort actions," to which plaintiff was entitled. Accord, Abrams v. Lightolier, Inc., 841 F. Supp. 584, 599 (D.N.J. 1994), aff'd, 50 F.3d 1204 (1995), and McKenna v. Pacific Rail Serv., 817 F. Supp. 498, 518 (D.N.J. 1993), vacated and remanded on other grounds, 32 F.3d 820 (3d Cir.1994), appeal after remand, 61 F.3d 895 (3d Cir.1995) (table), both applying New Jersey law to award prejudgment interest under the LAD. See also Montells v. Haynes, 133 N.J. 282, 291-93, 627 A.2d 654 (1993) (injuries under the LAD are more like personal injuries than claims involving economic harm).
Defendants contend that plaintiff's damages
were not sustained by plaintiff all at once; rather, they were a product of reduced earnings during the two years following her employment termination at Don Bosco. At the start of the third year, she began earning (in another school system) more than she had received at Don Bosco. Therefore, if plaintiff is entitled to prejudgment interest, it is on the judgment amount stretched out over a two and a half year period  the period in which the economic damages were sustained.
*662 The trial judge may consider this contention when ruling on the application. In this respect, it is noteworthy that under R. 4:42-11(b) prejudgment interest would not begin until at least six months after plaintiff was terminated.
In Preston v. The Claridge Hotel and Casino, Ltd., 231 N.J. Super. 81, 88-90, 555 A.2d 12 (App.Div. 1989), we also upheld an award of prejudgment interest on lost wages in a wrongful discharge case. We commented there on the demise of the traditional distinction between liquidated and unliquidated damages in the context of a prejudgment interest award and reasoned: "up until the time of judgment, [defendant] had exclusive use of the moneys that plaintiff would have earned and was entitled to recover." Id. at 90, 555 A.2d 12. We also pointed out that the dispute was not over the amount owed, but was over the existence of a contractual obligation for job security. Ibid. On the other hand, when a plaintiff is compensated for future lost wages, prejudgment interest is improper. Gilbert v. Durand Glass Mfg. Co., 258 N.J. Super. 320, 331-32, 609 A.2d 517 (App.Div. 1992).
Here, as in Preston, defendant had exclusive use of the money that plaintiff presumably would have earned and was entitled to recover. As in Preston, the dispute was not over the amount owed but over the underlying obligation. Defendants denied that they discriminated, and claimed exemption from the LAD. Thus, prejudgment interest was appropriate.
On the cross-appeal, the judgment in favor of the plaintiff is affirmed. On the direct appeal the judgment on the fee award is affirmed. The denial of costs and prejudgment interest is reversed and that aspect of the judgment is remanded for further proceedings.
NOTES
[1] As amicus Division on Civil Rights points out, N.J.S.A. 10:5-12(a) sets forth a slightly broader exemption for religious institutions:

it shall not be an unlawful employment practice ... for a religious association or organization to utilize religious affiliation as a uniform qualification in the employment of clergy, religious teachers or other employees engaged in the religious activities of the association or organization, or in following the tenets of its religion in establishing and utilizing criteria for employment of an employee....
[2] 42 U.S.C.A. 2000bb of RFRA states in full:

§ 2000bb. Congressional findings and declaration of purposes
(a) Findings
The Congress finds that 
(1) the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;
(2) laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;
(3) governments should not substantially burden religious exercise without compelling justification;
(4) in Employment Division v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and
(5) the compelling interest test as set forth in prior federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.
(b) Purposes
The purpose of this chapter are 
(1) to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and
(2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.
[3] The Fifth Circuit has recently declared RFRA constitutional in the face of a separation of powers challenge. Flores v. City of Boerne, 73 F.3d 1352 (5th Cir.1996). We agree with Judge Higginbotham's decision in Flores that RFRA was a valid exercise of Congress' power under Section 5 of the Fourteenth Amendment to enforce the provisions of that article, here the Due Process Clause. U.S. Const., Amend. XIV, § 5. There is "little room for doubt" that Congress intended to strengthen the rights guaranteed by the Free Exercise Clause of the First Amendment in adopting RFRA. Id. at 1358. See also Abordo v. Hawaii, 902 F. Supp. 1220 (D.Haw. 1995); Smith v. Fair Employment and Housing Commission, 12 Cal.4th 1143, 51 Cal. Rptr.2d 700, 913 P.2d 909 (1996) (decided April 9, 1996) (divided court held that Free Exercise Clause and RFRA did not sanction religiously motivated rental housing discrimination against unmarried couples in violation of state law against discrimination); South Jersey Catholic School Teachers Association v. St. Teresa, 290 N.J. Super. 359, 381, 675 A.2d 1155 (App.Div. 1996).
[4] Defendants assert that the RFRA "renders irrelevant" both Geary, supra, and DeMarco v. Holy Cross High School, 4 F.3d 166 (2d Cir.1993), which were decided prior to its enactment. However, neither Geary nor DeMarco utilized the free-exercise standard set forth in Employment Div. v. Smith, supra; both were Establishment Clause cases, concerned with excessive government entanglement with religion. Geary, supra, 7 F.3d at 327-31; DeMarco, supra, 4 F.3d at 169-72.

42 U.S.C.A. § 2000bb-4 provides: "Nothing in this Act shall be construed to affect, interpret, or in any way address that portion of the First Amendment prohibiting laws respecting the establishment of religion...." Thus, both Geary, supra, and DeMarco, supra, remain highly relevant for purposes of establishment clause analysis.